# ARGERSINGER *v.* HAMLIN, SHERIFF

No. 70–5015.   Argued December 6, 1971—Reargued February 28, 1972—Decided June 12, 1972

DOUGLAS, J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined. BRENNAN, J., filed a concurring opinion, in which DOUGLAS and STEWART, JJ., joined, *post*, p. 40. BURGER, C. J., filed an opinion concurring in the result, *post*, p. 41. POWELL, J., filed an opinion concurring in the result, in which REHNQUIST, J., joined, *post*, p. 44.

*Bruce S. Rogow* argued the cause for petitioner on the reargument and *J. Michael Shea* argued the cause *pro hac vice* on the original argument. With them on the brief was *P. A. Hubbart.*

*George R. Georgieff,* Assistant Attorney General of Florida, reargued the cause for respondent. With him on the brief were *Robert L. Shevin,* Attorney General, and *Raymond L. Marky,* Assistant Attorney General, joined by the Attorneys General for their respective States as follows: *Gary K. Nelson* of Arizona, *Arthur K.*

*Bolton* of Georgia, *W. Anthony Park* of Idaho, *Jack P. F. Gremillion* of Louisiana, *James S. Erwin* of Maine, *Robert L. Woodahl* of Montana, *Robert List* of Nevada, *Robert Morgan* of North Carolina, *Helgi Johanneson* of North Dakota, and *Daniel R. McLeod* of South Carolina.

*Solicitor General Griswold* argued the cause for the United States as *amicus curiae* on the reargument urging reversal. With him on the brief were *Assistant Attorney General Petersen, Deputy Solicitor General Greenawalt, Harry R. Sachse, Beatrice Rosenberg,* and *Sidney M. Glazer.*

Briefs of *amici curiae* urging reversal were filed by *William E. Hellerstein* for the Legal Aid Society of New York, and by *Marshall J. Hartman* for the National Legal Aid and Defender Association.

*Lauren Beasley,* Chief Assistant Attorney General of Utah, filed a brief for the Attorney General of Utah as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *John E. Havelock,* Attorney General, for the State of Alaska, and by *Andrew P. Miller,* Attorney General, and *Vann H. Lefcoe,* Assistant Attorney General, for the Commonwealth of Virginia.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioner, an indigent, was charged in Florida with carrying a concealed weapon, an offense punishable by imprisonment up to six months, a $1,000 fine, or both. The trial was to a judge, and petitioner was unrepresented by counsel. He was sentenced to serve 90 days in jail, and brought this habeas corpus action in the Florida Supreme Court, alleging that, being deprived of his right to counsel, he was unable as an indigent layman properly to raise and present to the trial court good and sufficient defenses to the charge for which he stands convicted. The Florida

Supreme Court by a four-to-three decision, in ruling on the right to counsel, followed the line we marked out in *Duncan* v. *Louisiana*, 391 U. S. 145, 159, as respects the right to trial by jury and held that the right to court-appointed counsel extends only to trials "for non-petty offenses punishable by more than six months imprisonment." 236 So. 2d 442, 443.[1]

The case is here on a petition for certiorari, whicn we granted. 401 U. S. 908. We reverse.

The Sixth Amendment, which in enumerated situations has been made applicable to the States by reason of the Fourteenth Amendment (see *Duncan* v. *Louisiana, supra; Washington* v. *Texas*, 388 U. S. 14; *Klopfer* v. *North Carolina*, 386 U. S. 213; *Pointer* v. *Texas*, 380 U. S. 400; *Gideon* v. *Wainwright*, 372 U. S. 335; and *In re Oliver*, 333 U. S. 257), provides specified standards for "all criminal prosecutions."

---

[1] For a survey of the opinions of judges, prosecutors, and defenders concerning the right to counsel of persons charged with misdemeanors, see 1 L. Silverstein, Defense of the Poor in Criminal Cases in American State Courts 127–135 (1965).

A review of federal and state decisions following *Gideon* is contained in Comment, Right to Counsel: The Impact of *Gideon* v. *Wainwright* in the Fifty States, 3 Creighton L. Rev. 103 (1970).

Twelve States provide counsel for indigents accused of "serious crime" in the misdemeanor category. *Id.*, at 119–124.

Nineteen States provide for the appointment of counsel in most misdemeanor cases. *Id.*, at 124–133. One of these is Oregon, whose Supreme Court said in *Stevenson* v. *Holzman*, 254 Ore. 94, 100–101, 458 P. 2d 414, 418, "If our objective is to insure a fair trial in every criminal prosecution the need for counsel is not determined by the seriousness of the crime. The assistance of counsel will best avoid conviction of the innocent—an objective as important in the municipal court as in a court of general jurisdiction."

California's requirement extends to traffic violations. *Blake* v. *Municipal Court*, 242 Cal. App. 2d 731, 51 Cal. Rptr. 771.

Overall, 31 States have now extended the right to defendants charged with crimes less serious than felonies. Comment, Right to Counsel, *supra*, at 134.

One is the requirement of a "public trial." *In re Oliver, supra,* held that the right to a "public trial" was applicable to a state proceeding even though only a 60-day sentence was involved. 333 U. S., at 272.

Another guarantee is the right to be informed of the nature and cause of the accusation. Still another, the right of confrontation. *Pointer v. Texas, supra.* And another, compulsory process for obtaining witnesses in one's favor. *Washington v. Texas, supra.* We have never limited these rights to felonies or to lesser but serious offenses.

In *Washington v. Texas, supra,* we said, "We have held that due process requires that the accused have the assistance of counsel for his defense, that he be confronted with the witnesses against him, and that he have the right to a speedy and public trial." 388 U. S., at 18. Respecting the right to a speedy and public trial, the right to be informed of the nature and cause of the accusation, the right to confront and cross-examine witnesses, the right to compulsory process for obtaining witnesses, it was recently stated, "It is simply not arguable, nor has any court ever held, that the trial of a petty offense may be held in secret, or without notice to the accused of the charges, or that in such cases the defendant has no right to confront his accusers or to compel the attendance of witnesses in his own behalf." Junker, The Right to Counsel in Misdemeanor Cases, 43 Wash. L. Rev. 685, 705 (1968).

*District of Columbia v. Clawans,* 300 U. S. 617, illustrates the point. There, the offense was engaging without a license in the business of dealing in second-hand property, an offense punishable by a fine of $300 or imprisonment for not more than 90 days. The Court held that the offense was a "petty" one and could be tried without a jury. But the conviction was reversed

and a new trial ordered, because the trial court had prejudicially restricted the right of cross-examination, a right guaranteed by the Sixth Amendment.

The right to trial by jury, also guaranteed by the Sixth Amendment by reason of the Fourteenth, was limited by *Duncan* v. *Louisiana, supra,* to trials where the potential punishment was imprisonment for six months or more. But, as the various opinions in *Baldwin* v. *New York,* 399 U. S. 66, make plain, the right to trial by jury has a different genealogy and is brigaded with a system of trial to a judge alone. As stated in *Duncan:*

> "Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence. The deep commitment of the Nation to the right of jury trial in serious criminal cases as a defense against arbitrary law enforcement qualifies for protection under the Due Process Clause of the Fourteenth Amendment, and must therefore be respected by the States." 391 U. S., at 156.

While there is historical support for limiting the "deep commitment" to trial by jury to "serious criminal cases,"[2] there is no such support for a similar limitation on the right to assistance of counsel:

"Originally, in England, a person charged with treason or felony was denied the aid of counsel, except in respect of legal questions which the accused himself might suggest. At the same time parties in civil cases and persons accused of misdemeanors were entitled to the full assistance of counsel. . . .

"[It] appears that in at least twelve of the thirteen colonies the rule of the English common law, in the respect now under consideration, had been definitely rejected and the right to counsel fully recognized in all criminal prosecutions, save that in one or two instances the right was limited to capital offenses or to the more serious crimes . . . ." Powell v. Alabama, 287 U. S. 45, 60, 64–65.

The Sixth Amendment thus extended the right to counsel beyond its common-law dimensions. But there is nothing in the language of the Amendment, its history, or in the decisions of this Court, to indicate that it was intended to embody a retraction of the right in petty offenses wherein the common law previously did require that counsel be provided. See James v. Headley, 410 F. 2d 325, 331–332, n. 9.

We reject, therefore, the premise that since prosecutions for crimes punishable by imprisonment for less than

---

[2] See Frankfurter & Corcoran, Petty Federal Offenses and the Constitutional Guaranty of Trial by Jury, 39 Harv. L. Rev. 917, 980–982 (1926); James v. Headley, 410 F. 2d 325, 331. Cf. Kaye, Petty Offenders Have No Peers!, 26 U. Chi. L. Rev. 245 (1959).

six months may be tried without a jury, they may also be tried without a lawyer.

The assistance of counsel is often a requisite to the very existence of a fair trial. The Court in *Powell* v. *Alabama, supra,* at 68–69—a capital case—said:

> "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect."

In *Gideon* v. *Wainwright, supra* (overruling *Betts* v. *Brady,* 316 U. S. 455), we dealt with a felony trial. But we did not so limit the need of the accused for a lawyer. We said:

> "[I]n our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him. This seems to us to be an obvious truth. Governments, both state and fed-

eral, quite properly spend vast sums of money to establish machinery to try defendants accused of crime. Lawyers to prosecute are everywhere deemed essential to protect the public's interest in an orderly society. Similarly, there are few defendants charged with crime, few indeed, who fail to hire the best lawyers they can get to prepare and present their defenses. That government hires lawyers to prosecute and defendants who have the money hire lawyers to defend are the strongest indications of the widespread belief that lawyers in criminal courts are necessities, not luxuries. The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him." 372 U. S., at 344.[3]

Both *Powell* and *Gideon* involved felonies. But their rationale has relevance to any criminal trial, where an accused is deprived of his liberty. *Powell* and *Gideon* suggest that there are certain fundamental rights applicable to all such criminal prosecutions, even those, such

---

[3] See also *Johnson* v. *Zerbst*, 304 U. S. 458, 462–463:

"[The Sixth Amendment] embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is [re]presented by experienced and learned counsel. That which is simple, orderly and necessary to the lawyer, to the untrained layman may appear intricate, complex and mysterious."

as *In re Oliver, supra,* where the penalty is 60 days' imprisonment:

> "A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, *and to be represented by counsel.*" 333 U. S., at 273 (emphasis supplied).

The requirement of counsel may well be necessary for a fair trial even in a petty-offense prosecution. We are by no means convinced that legal and constitutional questions involved in a case that actually leads to imprisonment even for a brief period are any less complex than when a person can be sent off for six months or more. See, *e. g., Powell* v. *Texas,* 392 U. S. 514; *Thompson* v. *Louisville,* 362 U. S. 199; *Shuttlesworth* v. *Birmingham,* 382 U. S. 87.

The trial of vagrancy cases is illustrative. While only brief sentences of imprisonment may be imposed, the cases often bristle with thorny constitutional questions. See *Papachristou* v. *Jacksonville,* 405 U. S. 156.

*In re Gault,* 387 U. S. 1, dealt with juvenile delinquency and an offense which, if committed by an adult, would have carried a fine of $5 to $50 or imprisonment in jail for not more than two months (*id.,* at 29), but which when committed by a juvenile might lead to his detention in a state institution until he reached the age of 21. *Id.,* at 36–37. We said (*id.,* at 36) that "[t]he juvenile needs the assistance of counsel to cope with problems of law, to make skilled inquiry into the facts, to insist upon regularity of the proceedings, and to ascertain whether he has a defense and to prepare and submit it. The child 'requires the guiding hand of coun-

sel at every step in the proceedings against him,' " citing *Powell* v. *Alabama*, 287 U. S., at 69. The premise of *Gault* is that even in prosecutions for offenses less serious than felonies, a fair trial may require the presence of a lawyer.

Beyond the problem of trials and appeals is that of the guilty plea, a problem which looms large in misdemeanor as well as in felony cases. Counsel is needed so that the accused may know precisely what he is doing, so that he is fully aware of the prospect of going to jail or prison, and so that he is treated fairly by the prosecution.

In addition, the volume of misdemeanor cases,[4] far greater in number than felony prosecutions, may create an obsession for speedy dispositions, regardless of the fairness of the result. The Report by the President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 128 (1967), states:

> "For example, until legislation last year increased the number of judges, the District of Columbia Court of General Sessions had four judges to process the preliminary stages of more than 1,500 felony cases, 7,500 serious misdemeanor cases, and 38,000 petty offenses and an equal number of traffic offenses per year. An inevitable consequence of volume that large is the almost total preoccupa-

---

[4] In 1965, 314,000 defendants were charged with felonies in state courts, and 24,000 were charged with felonies in federal courts. President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Courts 55 (1967). Exclusive of traffic offenses, however, it is estimated that there are annually between four and five million court cases involving misdemeanors. *Ibid.* And, while there are no authoritative figures, extrapolations indicate that there are probably between 40.8 and 50 million traffic offenses each year. Note, Dollars and Sense of an Expanded Right to Counsel, 55 Iowa L. Rev. 1249, 1261 (1970).

tion in such a court with the movement of cases. The calendar is long, speed often is substituted for care, and casually arranged out-of-court compromise too often is substituted for adjudication. Inadequate attention tends to be given to the individual defendant, whether in protecting his rights, sifting the facts at trial, deciding the social risk he presents, or determining how to deal with him after conviction. The frequent result is futility and failure. As Dean Edward Barrett recently observed:

" 'Wherever the visitor looks at the system, he finds great numbers of defendants being processed by harassed and overworked officials. Police have more cases than they can investigate. Prosecutors walk into courtrooms to try simple cases as they take their initial looks at the files. Defense lawyers appear having had no more than time for hasty conversations with their clients. Judges face long calendars with the certain knowledge that their calendars tomorrow and the next day will be, if anything, longer, and so there is no choice but to dispose of the cases.

" 'Suddenly it becomes clear that for most defendants in the criminal process, there is scant regard for them as individuals. They are numbers on dockets, faceless ones to be processed and sent on their way. The gap between the theory and the reality is enormous.

" 'Very little such observation of the administration of criminal justice in operation is required to reach the conclusion that it suffers from basic ills.' "

That picture is seen in almost every report. "The misdemeanor trial is characterized by insufficient and frequently irresponsible preparation on the part of the defense, the prosecution, and the court. Everything is rush, rush." Hellerstein, The Importance of the Mis-

demeanor Case on Trial and Appeal, 28 The Legal Aid Brief Case 151, 152 (1970).

There is evidence of the prejudice which results to misdemeanor defendants from this "assembly-line justice." One study concluded that "[m]isdemeanants represented by attorneys are five times as likely to emerge from police court with all charges dismissed as are defendants who face similar charges without counsel." American Civil Liberties Union, Legal Counsel for Misdemeanants, Preliminary Report 1 (1970).

We must conclude, therefore, that the problems associated with misdemeanor and petty [5] offenses often

---

[5] Title 18 U. S. C. § 1 defines a petty offense as one in which the penalty does not exceed imprisonment for six months, or a fine of not more than $500, or both. Title 18 U. S. C. § 3006A (b) provides for the appointment of counsel for indigents in all cases "other than a petty offense." But, as the Court of Appeals for the Fifth Circuit noted in *James* v. *Headley*, 410 F. 2d, at 330–331, 18 U. S. C. § 3006A, which was enacted as the Criminal Justice Act of 1964, contains a congressional plan for furnishing legal representation at federal expense for certain indigents and does not purport to cover the full range of constitutional rights to counsel.

Indeed, the Conference Report on the Criminal Justice Act of 1964 made clear the conferees' belief that the right to counsel extends to all offenses, petty and serious alike. H. R. Conf. Rep. No. 1709, 88th Cong., 2d Sess. (1964).

In that connection, the Federal Rules of Criminal Procedure, as amended in 1966, provide in Rule 44 (a): "Every defendant who is unable to obtain counsel shall be entitled to have counsel assigned to represent him at every stage of the proceedings from his initial appearance before the commissioner or the court through appeal, unless he waives such appointment."

The Advisory Committee note on Rule 44 says: "Like the original rule the amended rule provides a right to counsel which is broader in two respects than that for which compensation is provided in the Criminal Justice Act of 1964:

"(1) The right extends to petty offenses to be tried in the district courts, and

"(2) The right extends to defendants unable to obtain counsel for reasons other than financial."

require the presence of counsel to insure the accused a fair trial. MR. JUSTICE POWELL suggests that these problems are raised even in situations where there is no prospect of imprisonment. *Post,* at 48. We need not consider the requirements of the Sixth Amendment as regards the right to counsel where loss of liberty is not involved, however, for here petitioner was in fact sentenced to jail. And, as we said in *Baldwin* v. *New York,* 399 U. S., at 73, "the prospect of imprisonment for however short a time will seldom be viewed by the accused as a trivial or 'petty' matter and may well result in quite serious repercussions affecting his career and his reputation." [6]

We hold, therefore, that absent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel at his trial.[7]

That is the view of the Supreme Court of Oregon, with which we agree. It said in *Stevenson* v. *Holzman,* 254 Ore. 94, 102, 458 P. 2d 414, 418:

"We hold that no person may be deprived of his

---

[6] See *Marston* v. *Oliver,* 324 F. Supp. 691, 696 (ED Va. 1971): "Any incarceration of over thirty days, more or less, will usually result in loss of employment, with a consequent substantial detriment to the defendant and his family."

[7] We do not share MR. JUSTICE POWELL's doubt that the Nation's legal resources are sufficient to implement the rule we announce today. It has been estimated that between 1,575 and 2,300 full-time counsel would be required to represent *all* indigent misdemeanants, excluding traffic offenders. Note, Dollars and Sense of an Expanded Right to Counsel, 55 Iowa L. Rev. 1249, 1260–1261 (1970). These figures are relatively insignificant when compared to the estimated 355,200 attorneys in the United States (Statistical Abstract of the United States 153 (1971)), a number which is projected to double by the year 1985. See Ruud, That Burgeoning Law School Enrollment, 58 A. B. A. J. 146, 147. Indeed, there are 18,000 new admissions to the bar each year—3,500 more lawyers than are required to fill the "estimated 14,500 average annual openings." *Id.,* at 148.

liberty who has been denied the assistance of counsel as guaranteed by the Sixth Amendment. This holding is applicable to all criminal prosecutions, including prosecutions for violations of municipal ordinances. The denial of the assistance of counsel will preclude the imposition of a jail sentence." [8]

We do not sit as an ombudsman to direct state courts how to manage their affairs but only to make clear the federal-constitutional requirement. How crimes should be classified is largely a state matter.[9] The fact that traffic charges technically fall within the category of "criminal prosecutions" does not necessarily mean that many of them will be brought into the class [10] where imprisonment actually occurs.

---

[8] Article I, § 9, of the proposed Revised Constitution of Oregon provides:

"Every person has the right to assistance of counsel in all official proceedings and dealings with public officers that may materially affect him. If he cannot afford counsel, he has the right to have counsel appointed for him in any case in which he may lose his liberty."

[9] One partial solution to the problem of minor offenses may well be to remove them from the court system. The American Bar Association Special Committee on Crime Prevention and Control recently recommended, inter alia, that:

"Regulation of various types of conduct which harm no one other than those involved (e. g., public drunkenness, narcotics addiction, vagrancy, and deviant sexual behavior) should be taken out of the courts. The handling of these matters should be transferred to nonjudicial entities, such as detoxification centers, narcotics treatment centers and social service agencies. The handling of other nonserious offenses, such as housing code and traffic violations, should be transferred to specialized administrative bodies." ABA Report, New Perspectives on Urban Crime iv (1972). Such a solution, of course, is peculiarly within the province of state and local legislatures.

[10] "Forty thousand traffic charges (arising out of 150,000 nonparking traffic citations) were disposed of by court action in Seattle during 1964. The study showed, however, that in only about 4,500 cases was there any possibility of imprisonment as the result of a

The American Bar Association Project on Standards
for Criminal Justice states:

> "As a matter of sound judicial administration it
> is preferable to disregard the characterization of the
> offense as felony, misdemeanor or traffic offense.
> Nor is it adequate to require the provision of defense
> services for all offenses which carry a sentence to
> jail or prison. Often, as a practical matter, such
> sentences are rarely if ever imposed for certain types
> of offenses, so that for all intents and purposes the
> punishment they carry is at most a fine. Thus, the
> standard seeks to distinguish those classes of cases
> in which there is real likelihood that incarceration
> may follow conviction from those types in which
> there is no such likelihood. It should be noted that
> the standard does not recommend a determination
> of the need for counsel in terms of the facts of each
> particular case; it draws a categorical line at those
> *types* of offenses for which incarceration as a punish-
> ment is a practical possibility." Providing Defense
> Services 40 (Approved Draft 1968).

---

traffic conviction. In only three kinds of cases was the accused
exposed to any danger of imprisonment: (1) where the offense
charged was hit-and-run, reckless or drunken driving; or (2) where
any additional traffic violation was charged against an individual
subject to a suspended sentence for a previous violation; or
(3) where, whatever the offense charged, the convicted individual
was unable to pay the fine imposed." Junker, The Right to Coun-
sel in Misdemeanor Cases, 43 Wash. L. Rev. 685, 711 (1968).

Of the 1,288,975 people convicted by the City of New York in
1970 for traffic infractions such as jaywalking and speeding, only
24 were fined and imprisoned, given suspended sentences, or jailed.
Criminal Court of the City of New York Annual Report 11 (1970).
Of the 19,187 convicted of more serious traffic offenses, such as
driving under the influence, reckless driving, and leaving the scene
of an accident, 404 (2.1%) were subject to some form of imprison-
ment. *Ibid.*

Under the rule we announce today, every judge will know when the trial of a misdemeanor starts that no imprisonment may be imposed, even though local law permits it, unless the accused is represented by counsel. He will have a measure of the seriousness and gravity of the offense and therefore know when to name a lawyer to represent the accused before the trial starts.

The run of misdemeanors will not be affected by today's ruling. But in those that end up in the actual deprivation of a person's liberty, the accused will receive the benefit of "the guiding hand of counsel" so necessary when one's liberty is in jeopardy.

*Reversed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE STEWART join, concurring.

I join the opinion of the Court and add only an observation upon its discussion of legal resources, *ante,* at 37 n. 7. Law students as well as practicing attorneys may provide an important source of legal representation for the indigent. The Council on Legal Education for Professional Responsibility (CLEPR) informs us that more than 125 of the country's 147 accredited law schools have established clinical programs in which faculty-supervised students aid clients in a variety of civil and criminal matters.* CLEPR Newsletter, May 1972, p. 2. These programs supplement practice rules enacted in 38 States authorizing students to practice law under prescribed conditions. *Ibid.* Like the American Bar Association's Model Student Practice Rule (1969), most of these regulations permit students to make supervised

---

*A total of 57 law schools have also established clinical programs in corrections, where law students, under faculty supervision, aid prisoners in the preparation of petitions for post-conviction relief. CLEPR Newsletter, May 1972, p. 3. See *United States* v. *Simpson,* 141 U. S. App. D. C. 8, 15–16, 436 F. 2d 162, 169–170 (1970).

court appearances as defense counsel in criminal cases. CLEPR, State Rules Permitting the Student Practice of Law: Comparisons and Comments 13 (1971). Given the huge increase in law school enrollments over the past few years, see Ruud, That Burgeoning Law School Enrollment, 58 A. B. A. J. 146 (1972), I think it plain that law students can be expected to make a significant contribution, quantitatively and qualitatively, to the representation of the poor in many areas, including cases reached by today's decision.

MR. CHIEF JUSTICE BURGER, concurring in the result.

I agree with much of the analysis in the opinion of the Court and with MR. JUSTICE POWELL's appraisal of the problems. Were I able to confine my focus solely to the burden that the States will have to bear in providing counsel, I would be inclined, at this stage of the development of the constitutional right to counsel, to conclude that there is much to commend drawing the line at penalties in excess of six months' confinement. Yet several cogent factors suggest the infirmities in any approach that allows confinement for any period without the aid of counsel at trial; any deprivation of liberty is a serious matter. The issues that must be dealt with in a trial for a petty offense or a misdemeanor may often be simpler than those involved in a felony trial and yet be beyond the capability of a layman, especially when he is opposed by a law-trained prosecutor. There is little ground, therefore, to assume that a defendant, unaided by counsel, will be any more able adequately to defend himself against the lesser charges that may involve confinement than more serious charges. Appeal from a conviction after an uncounseled trial is not likely to be of much help to a defendant since the die is usually cast when judgment is entered on an uncounseled trial record.

Trial judges sitting in petty and misdemeanor cases—and prosecutors—should recognize exactly what will be required by today's decision. Because no individual can be imprisoned unless he is represented by counsel, the trial judge and the prosecutor will have to engage in a predictive evaluation of each case to determine whether there is a significant likelihood that, if the defendant is convicted, the trial judge will sentence him to a jail term. The judge can preserve the option of a jail sentence only by offering counsel to any defendant unable to retain counsel on his own. This need to predict will place a new load on courts already overburdened and already compelled to deal with far more cases in one day than is reasonable and proper. Yet the prediction is not one beyond the capacity of an experienced judge, aided as he should be by the prosecuting officer. As to jury cases, the latter should be prepared to inform the judge as to any prior record of the accused, the general nature of the case against the accused, including any use of violence, the severity of harm to the victim, the impact on the community, and the other factors relevant to the sentencing process. Since the judge ought to have some degree of such information after judgment of guilt is determined, ways can be found in the more serious misdemeanor cases when jury trial is not waived to make it available to the judge before trial.* This will not mean a full "presentence" report on every defendant in every case before the jury passes on guilt, but a prosecutor should know before trial whether he intends to urge a jail sentence, and if he does he should be prepared to aid the court with the factual and legal basis for his view on that score.

---

*In a nonjury case the prior record of the accused should not be made known to the trier of fact except by way of traditional impeachment.

This will mean not only that more defense counsel must be provided, but also additional prosecutors and better facilities for securing information about the accused as it bears on the probability of a decision to confine.

The step we take today should cause no surprise to the legal profession. More than five years ago the profession, speaking through the American Bar Association in a Report on Standards Relating to Providing Defense Services, determined that society's goal should be "that the *system* for providing counsel and facilities for the defense be as good as the system which society provides for the prosecution." American Bar Association Project on Standards for Criminal Justice, Providing Defense Services 1 (Approved Draft 1968). The ABA was not addressing itelf, as we must in this case, to the constitutional requirement but only to the broad policy issue. Elsewhere in the Report the ABA stated that:

> "The fundamental premise of these standards is that representation by counsel is desirable in criminal cases both from the viewpoint of the defendant and of society." *Id.*, at 3.

After considering the same general factors involved in the issue we decide today, the ABA Report specifically concluded that:

> "Counsel should be provided in all criminal proceedings for offenses punishable by loss of liberty, except those types of offenses for which such punishment is not likely to be imposed, regardless of their denomination as felonies, misdemeanors or otherwise." *Id.*, § 4.1, pp. 37–38.

In a companion ABA Report on Standards Relating to the Prosecution Function and the Defense Function

the same basic theme appears in the positive standard cast in these terms:

> "Counsel for the accused is an essential component of the administration of criminal justice. A court properly constituted to hear a criminal case must be viewed as a tripartite entity consisting of the judge (and jury, where appropriate), counsel for the prosecution, and counsel for the accused." *Id.*, at 153 (Approved Draft 1968).

The right to counsel has historically been an evolving concept. The constitutional requirements with respect to the issue have dated in recent times from *Powell* v. *Alabama,* 287 U. S. 45 (1932), to *Gideon* v. *Wainwright,* 372 U. S. 335 (1963). Part of this evolution has been expressed in the policy prescriptions of the legal profession itself, and the contributions of the organized bar and individual lawyers—such as those appointed to represent the indigent defendants in the *Powell* and *Gideon* cases—have been notable. The holding of the Court today may well add large new burdens on a profession already overtaxed, but the dynamics of the profession have a way of rising to the burdens placed on it.

MR. JUSTICE POWELL, with whom MR. JUSTICE REHN-QUIST joins, concurring in the result.

*Gideon* v. *Wainwright,* 372 U. S. 335 (1963), held that the States were required by the Due Process Clause of the Fourteenth Amendment to furnish counsel to all indigent defendants charged with felonies.[1] The ques-

---

[1] While it is true that Mr. Justice Black's opinion for the Court in *Gideon* is not narrowly written, Mr. Justice Harlan was quick to suggest, in his concurring opinion, that the facts in *Gideon* did not require the Court to decide whether the indigent's right to appointed counsel should extend to all criminal cases. 372 U. S., at 351. In opinions announced more recently, the Court has assumed

tion before us today is whether an indigent defendant convicted of an offense carrying a maximum punishment of six months' imprisonment, a fine of $1,000, or both, and sentenced to 90 days in jail, is entitled as a matter of constitutional right to the assistance of appointed counsel. The broader question is whether the Due Process Clause requires that an indigent charged with a state petty offense [2] be afforded the right to appointed counsel.

In the case under review, the Supreme Court of Florida agreed that indigents charged with serious misdemeanors were entitled to appointed counsel, but, by a vote of four to three, it limited that right to offenses punishable by more than six months' imprisonment.[3] The state court, in drawing a six-month line, followed the lead of this Court in *Duncan* v. *Louisiana*, 391 U. S. 145 (1968), and in the subsequent case of *Baldwin* v. *New York*, 399 U. S. 66 (1970), which was decided shortly after the opinion below, in which the Court held that the due process right to a trial by jury in state criminal cases was limited to cases in which the offense charged was punishable by more than six months' imprisonment. It is clear that wherever the right-to-counsel line is to be drawn, it must be drawn so that an indigent

that the holding of *Gideon* has not yet been extended to misdemeanor cases. See *In re Gault,* 387 U. S. 1, 29 (1967); *Mempa* v. *Rhay,* 389 U. S. 128, 134 (1967); *Burgett* v. *Texas,* 389 U. S. 109, 114 (1967); *Loper* v. *Beto,* 405 U. S. 473 (1972).

[2] As used herein, the term "petty offense" means any offense where the authorized imprisonment does not exceed six months, *Baldwin* v. *New York,* 399 U. S. 66, 69 (1970). It also includes all offenses not punishable by imprisonment, regardless of the amount of any fine that might be authorized. To this extent, the definition used herein differs from the federal statutory definition of "petty offense," which includes offenses punishable by not more than six months' imprisonment or by a fine not exceeding $500. 18 U. S. C. § 1.

[3] 236 So. 2d 442 (1970).

has a right to appointed counsel in all cases in which there is a due process right to a jury trial. An unskilled layman may be able to defend himself in a nonjury trial before a judge experienced in piecing together unassembled facts, but before a jury the guiding hand of counsel is needed to marshal the evidence into a coherent whole consistent with the best case on behalf of the defendant. If there is no accompanying right to counsel, the right to trial by jury becomes meaningless.

Limiting the right to jury trial to cases in which the offense charged is punishable by more than six months' imprisonment does not compel the conclusion that the indigent's right to appointed counsel must be similarly restricted. The Court's opinions in *Duncan, Baldwin,* and *District of Columbia* v. *Clawans,* 300 U. S. 617 (1937), reveal that the jury-trial limitation has historic origins at common law. No such history exists to support a similar limitation of the right to counsel; to the contrary, at common law, the right to counsel was available in misdemeanor but not in felony cases.[4] Only as recently as *Gideon* has an indigent in a state trial had a right to appointed counsel in felony cases. Moreover, the interest protected by the right to have guilt or innocence determined by a jury—tempering the possibly arbitrary and harsh exercise of prosecutorial and judicial power[5]—while important, is not as fundamental to the guarantee of a fair trial as is the right to counsel.[6]

---

[4] See *Powell* v. *Alabama,* 287 U. S. 45, 60–61 (1932).

[5] *Duncan* v. *Louisiana,* 391 U. S. 145, 156 (1968).

[6] Although we have given retroactive effect to our ruling in *Gideon, Pickelsimer* v. *Wainwright,* 375 U. S. 2 (1963), we have said that, "[t]he values implemented by the right to jury trial would not measurably be served by requiring retrial of all persons convicted in the past by procedures not consistent with the Sixth Amendment right to jury trial." *DeStefano* v. *Woods,* 392 U. S. 631, 634 (1968).

I am unable to agree with the Supreme Court of Florida that an indigent defendant, charged with a petty offense, may in every case be afforded a fair trial without the assistance of counsel. Nor can I agree with the new rule of due process, today enunciated by the Court, that "absent a knowing and intelligent waiver, no person may be imprisoned . . . unless he was represented by counsel at his trial." *Ante,* at 37. It seems to me that the line should not be drawn with such rigidity.

There is a middle course, between the extremes of Florida's six-month rule and the Court's rule, which comports with the requirements of the Fourteenth Amendment. I would adhere to the principle of due process that requires fundamental fairness in criminal trials, a principle which I believe encompasses the right to counsel in petty cases whenever the assistance of counsel is necessary to assure a fair trial.

I

I am in accord with the Court that an indigent accused's need for the assistance of counsel does not mysteriously evaporate when he is charged with an offense punishable by six months or less. In *Powell* v. *Alabama*[7] and *Gideon,*[8] both of which involved felony prosecutions, this Court noted that few laymen can present adequately their own cases, much less identify and argue relevant legal questions. Many petty offenses will also present complex legal and factual issues that may not be fairly tried if the defendant is not assisted by counsel. Even in relatively simple cases, some defendants, because of ignorance or some other handicap, will be incapable of defending themselves. The consequences of a misdemeanor conviction, whether they be a brief period served under the sometimes deplorable con-

[7] *Supra,* n. 4, at 68–69.
[8] 372 U. S., at 343–345.

ditions found in local jails or the effect of a criminal record on employability, are frequently of sufficient magnitude not to be casually dismissed by the label "petty." [9]

Serious consequences also may result from convictions not punishable by imprisonment. Stigma may attach to a drunken-driving conviction or a hit-and-run escapade.[10] Losing one's driver's license is more serious for some individuals than a brief stay in jail. In *Bell* v. *Burson*, 402 U. S. 535 (1971), we said:

> "Once licenses are issued, as in petitioner's case, their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment." *Id.*, at 539.

When the deprivation of property rights and interests is of sufficient consequence,[11] denying the assistance of counsel to indigents who are incapable of defending themselves is a denial of due process.

---

[9] See 1 L. Silverstein, Defense of the Poor in Criminal Cases in American State Courts 132 (1965).

[10] See *James* v. *Headley,* 410 F. 2d 325, 334–335 (CA5 1969).

[11] A wide range of civil disabilities may result from misdemeanor convictions, such as forfeiture of public office (*State ex rel. Stinger* v. *Kruger,* 280 Mo. 293, 217 S. W. 310 (1919)), disqualification for a licensed profession (Cal. Bus. & Prof. Code § 3094 (1962)' (optometrists); N. C. Gen. Stat. § 93A–4 (b) (1965) (real estate brokers)), and loss of pension rights (Fla. Stat. Ann. § 185.18 (3) (1966) (police disability pension denied when injury is result of participation in fights, riots, civil insurrections, or while committing crime); Ind. Ann. Stat. § 28–4616 (1948) (teacher convicted of misdemeanor resulting in imprisonment); Pa. Stat. Ann., Tit. 53, § 39323 (Supp. 1972–1973) and § 65599 (1957) (conviction of crime or misdemeanor)). See generally Project, The Collateral Consequences of a Criminal Conviction, 23 Vand. L. Rev. 929 (1970).

This is not to say that due process requires the appointment of counsel in all petty cases, or that assessment of the possible consequences of conviction is the sole test for the need for assistance of counsel. The flat six-month rule of the Florida court and the equally inflexible rule of the majority opinion apply to *all* cases within their defined areas regardless of circumstances. It is precisely because of this mechanistic application that I find these alternatives unsatisfactory. Due process, perhaps the most fundamental concept in our law, embodies principles of fairness rather than immutable line drawing as to every aspect of a criminal trial. While counsel is often essential to a fair trial, this is by no means a universal fact. Some petty offense cases are complex; others are exceedingly simple. As a justification for furnishing counsel to indigents accused of felonies, this Court noted, "That government hires lawyers to prosecute and defendants who have the money hire lawyers to defend are the strongest indications of the widespread belief that lawyers in criminal courts are necessities, not luxuries." [12] Yet government often does not hire lawyers to prosecute petty offenses; instead the arresting police officer presents the case. Nor does every defendant who can afford to do so hire lawyers to defend petty charges. Where the possibility of a jail sentence is remote and the probable fine seems small, or where the evidence of guilt is overwhelming, the costs of assistance of counsel may exceed the benefits. [13] It is anomalous that the Court's opinion today will extend

[12] *Gideon* v. *Wainwright*, 372 U. S., at 344.

[13] In petty offenses, there is much less plea negotiation than in serious offenses. See Report by the President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society (hereinafter Challenge) 134 (1967). Thus, in cases where the evidence of guilt is overwhelming, the assistance of counsel is less essential to obtain a lighter sentence.

the right of appointed counsel to indigent defendants in cases where the right to counsel would rarely be exercised by nonindigent defendants.

Indeed, one of the effects of this ruling will be to favor defendants classified as indigents over those not so classified, yet who are in low-income groups where engaging counsel in a minor petty-offense case would be a luxury the family could not afford. The line between indigency and assumed capacity to pay for counsel is necessarily somewhat arbitrary, drawn differently from State to State and often resulting in serious inequities to accused persons. The Court's new rule will accent the disadvantage of being barely self-sufficient economically.

A survey of state courts in which misdemeanors are tried showed that procedures were often informal, presided over by lay judges. Jury trials were rare, and the prosecution was not vigorous.[14] It is as inaccurate to say that no defendant can obtain a fair trial without the assistance of counsel in such courts as it is to say that no defendant needs the assistance of counsel if the offense charged is only a petty one.[15]

Despite its overbreadth, the easiest solution would be a prophylactic rule that would require the appointment of counsel to indigents in all criminal cases. The simplicity of such a rule is appealing because it could be

[14] Silverstein, *supra*, n. 9, at 125–126.

[15] Neither the Report by the President's Commission on Law Enforcement and Administration of Justice nor the American Bar Association went the route the Court takes today. The President's Commission recommended that counsel be provided for criminal defendants who face "a significant penalty" and at least to those who are in danger of "substantial loss of liberty." Challenge, *supra*, n. 13, at 150. The American Bar Association standard would not extend the right to counsel to cases where "loss of liberty" is not "likely to be imposed." American Bar Association Project on Standards for Criminal Justice, Providing Defense Services 37–40 (Approved Draft 1968). Neither supports a new, inflexible constitutional rule.

applied automatically in every case, but the price of
pursuing this easy course could be high indeed in terms
of its adverse impact on the administration of the crimi-
nal justice systems of 50 States.  This is apparent when
one reflects on the wide variety of petty or misdemeanor
offenses, the varying definitions thereof, and the diversity
of penalties prescribed.  The potential impact on state
court systems is also apparent in view of the variations
in types of courts and their jurisdictions, ranging from
justices of the peace and part-time judges in the small
communities to the elaborately staffed police courts
which operate 24 hours a day in the great metropolitan
centers.

The rule adopted today does not go all the way.  It
is limited to petty-offense cases in which the sentence
is some imprisonment.  The thrust of the Court's posi-
tion indicates, however, that when the decision must
be made, the rule will be extended to all petty-offense
cases except perhaps the most minor traffic violations.
If the Court rejects on constitutional grounds, as it has
today, the exercise of any judicial discretion as to need
for counsel if a jail sentence is imposed, one must as-
sume a similar rejection of discretion in other petty-
offense cases.  It would be illogical—and without dis-
cernible support in the Constitution—to hold that no
discretion may ever be exercised where a nominal jail
sentence is contemplated and at the same time endorse
the legitimacy of discretion in "non-jail" petty-offense
cases which may result in far more serious consequences
than a few hours or days of incarceration.

The Fifth and Fourteenth Amendments guarantee that
property, as well as life and liberty, may not be taken
from a person without affording him due process of law.
The majority opinion suggests no constitutional basis
for distinguishing between deprivations of liberty and
property.  In fact, the majority suggests no reason at

all for drawing this distinction. The logic it advances for extending the right to counsel to all cases in which the penalty of any imprisonment is imposed applies equally well to cases in which other penalties may be imposed. Nor does the majority deny that some "non-jail" penalties are more serious than brief jail sentences.

Thus, although the new rule is extended today only to the imprisonment category of cases, the Court's opinion foreshadows the adoption of a broad prophylactic rule applicable to all petty offenses. No one can foresee the consequences of such a drastic enlargement of the constitutional right to free counsel. But even today's decision could have a seriously adverse impact upon the day-to-day functioning of the criminal justice system. We should be slow to fashion a new constitutional rule with consequences of such unknown dimensions, especially since it is supported neither by history nor precedent.

## II

The majority opinion concludes that, absent a valid waiver, a person may not be imprisoned even for lesser offenses unless he was represented by counsel at the trial. In simplest terms this means that under no circumstances, in any court in the land, may anyone be imprisoned—however briefly—unless he was represented by, or waived his right to, counsel. The opinion is disquietingly barren of details as to how this rule will be implemented.

There are thousands of statutes and ordinances which authorize imprisonment for six months or less, usually as an alternative to a fine. These offenses include some of the most trivial of misdemeanors, ranging from spitting on the sidewalk to certain traffic offenses. They also include a variety of more serious misdemeanors. This broad spectrum of petty-offense cases daily floods the lower criminal courts. The rule laid down today

will confront the judges of each of these courts with an awkward dilemma. If counsel is not appointed or knowingly waived, no sentence of imprisonment for any duration may be imposed. The judge will therefore be forced to decide in advance of trial—and without hearing the evidence—whether he will forgo entirely his judicial discretion to impose some sentence of imprisonment and abandon his responsibility to consider the full range of punishments established by the legislature. His alternatives, assuming the availability of counsel, will be to appoint counsel and retain the discretion vested in him by law, or to abandon this discretion in advance and proceed without counsel.

If the latter course is followed, the first victim of the new rule is likely to be the concept that justice requires a personalized decision both as to guilt and the sentence. The notion that sentencing should be tailored to fit the crime and the individual would have to be abandoned in many categories of offenses. In resolving the dilemma as to how to administer the new rule, judges will be tempted arbitrarily to divide petty offenses into two categories—those for which sentences of imprisonment may be imposed and those in which no such sentence will be given regardless of the statutory authorization. In creating categories of offenses which by law are imprisonable but for which he would not impose jail sentences, a judge will be overruling *de facto* the legislative determination as to the appropriate range of punishment for the particular offense. It is true, as the majority notes, that there are some classes of imprisonable offenses for which imprisonment is rarely imposed. But even in these, the occasional imposition of such a sentence may serve a valuable deterrent purpose. At least the legislatures, and until today the courts, have viewed the threat of

imprisonment—even when rarely carried out—as serving a legitimate social function.

In the brief for the United States as *amicus curiae,* the Solicitor General suggested that some flexibility could be preserved through the technique of trial *de novo* if the evidence—contrary to pretrial assumptions—justified a jail sentence. Presumably a mistrial would be declared, counsel appointed, and a new trial ordered. But the Solicitor General also recognized that a second trial, even with counsel, might be unfair if the prosecutor could make use of evidence which came out at the first trial when the accused was uncounseled. If the second trial were held before the same judge, he might no longer be open-minded. Finally, a second trial held for no other reason than to afford the judge an opportunity to impose a harsher sentence might run afoul of the guarantee against being twice placed in jeopardy for the same offense.[16] In all likelihood, there will be no second trial and certain offenses classified by legislatures as imprisonable, will be treated by judges as unimprisonable.

The new rule announced today also could result in equal protection problems. There may well be an unfair and unequal treatment of individual defendants, depending on whether the individual judge has determined in advance to leave open the option of imprisonment. Thus, an accused indigent would be entitled in some courts to counsel while in other courts in the same jurisdiction an indigent accused of the same offense would have no counsel. Since the services of counsel may be essential to a fair trial even in cases in which no jail sentence is imposed, the results of this type of pretrial judgment could be arbitrary and discriminatory.

---

[16] See *Callan* v. *Wilson,* 127 U. S. 540 (1888); *North Carolina* v. *Pearce,* 395 U. S. 711 (1969).

A different type of discrimination could result in the typical petty-offense case where judgment in the alternative is prescribed: for example, "five days in jail or $100 fine." If a judge has predetermined that no imprisonment will be imposed with respect to a particular category of cases, the indigent who is convicted will often receive no meaningful sentence. The defendant who can pay a $100 fine, and does so, will have responded to the sentence in accordance with law, whereas the indigent who commits the identical offense may pay no penalty. Nor would there be any deterrent against the repetition of similar offenses by indigents.[17]

To avoid these equal protection problems and to preserve a range of sentencing options as prescribed by law, most judges are likely to appoint counsel for indigents in all but the most minor offenses where jail sentences are extremely rare. It is doubtful that the States possess the necessary resources to meet this sudden expansion of the right to counsel. The Solicitor General, who suggested on behalf of the United States the rule the Court today adopts, recognized that the consequences could be far reaching. In addition to the expense of compensating counsel, he noted that the mandatory requirement of defense counsel will "require more pre-trial time of prosecutors, more courtroom time, and this will lead to bigger backlogs with present personnel. Court reporters will be needed as well as counsel, and they are one of our worst bottlenecks."[18]

---

[17] The type of penalty discussed above (involving the discretionary alternative of "jail or fine") presents serious problems of fairness—both to indigents and nonindigents and to the administration of justice. Cf. *Tate* v. *Short,* 401 U. S. 395 (1971). No adequate resolution of these inherently difficult problems has yet been found. The rule adopted by the Court today, depriving the lower courts of all discretion in such cases unless counsel is available and is appointed, could aggravate the problem.

[18] Tr. of Oral Arg. 34–35.

After emphasizing that the new constitutional rule should not be made retroactive, the Solicitor General commented on the "chaos" which could result from any mandatory requirement of counsel in misdemeanor cases:

> "[I]f . . . this Court's decision should become fully applicable on the day it is announced, there could be a massive pileup in the state courts which do not now meet this standard. This would involve delays and frustrations which would not be a real contribution to the administration of justice." [19]

The degree of the Solicitor General's concern is reflected by his admittedly unique suggestion regarding the extraordinary demand for counsel which would result from the new rule. Recognizing implicitly that, in many sections of the country, there simply will not be enough lawyers available to meet this demand either in the short or long term, the Solicitor General speculated whether "clergymen, social workers, probation officers, and other persons of that type" could be used "as counsel in certain types of cases involving relatively small sentences." [20] Quite apart from the practical and political problem of amending the laws of each of the 50 States which require a license to practice law, it is difficult to square this suggestion with the meaning of the term "assistance of counsel" long recognized in our law.

The majority's treatment of the consequences of the new rule which so concerned the Solicitor General is not reassuring. In a footnote, it is said that there are presently 355,200 attorneys and that the number will increase rapidly, doubling by 1985. This is asserted to be sufficient to provide the number of full-time counsel, estimated by one source at between 1,575 and 2,300, to represent all indigent misdemeanants, excluding traffic

---

[19] *Id.*, at 36–37.

[20] *Id.*, at 39.

offenders. It is totally unrealistic to imply that 355,200 lawyers are potentially available. Thousands of these are not in practice, and many of those who do practice work for governments, corporate legal departments, or the Armed Services and are unavailable for criminal representation. Of those in general practice, we have no indication how many are qualified to defend criminal cases or willing to accept assignments which may prove less than lucrative for most.[21]

It is similarly unrealistic to suggest that implementation of the Court's new rule will require no more than 1,575 to 2,300 "full-time" lawyers. In few communities are there full-time public defenders available for, or private lawyers specializing in, petty cases. Thus, if it were possible at all, it would be necessary to coordinate the schedules of those lawyers who are willing to take an

---

[21] The custom in many, if not most, localities is to appoint counsel on a case-by-case basis. Compensation is generally inadequate. Even in the federal courts under the Criminal Justice Act of 1964, 18 U. S. C. § 3006A, which provides one of the most generous compensation plans, the rates for appointed counsel—$20 per hour spent out of court, $30 per hour of court time, subject to a maximum total fee of $400 for a misdemeanor case and $1,000 for a felony—are low by American standards. Consequently, the majority of persons willing to accept appointments are the young and inexperienced. See Cappelletti, Part One: The Emergence of a Modern Theme, in Cappelletti & Gordley, Legal Aid: Modern Themes and Variations, 24 Stan. L. Rev. 347, 377–378 (1972). MR. JUSTICE BRENNAN suggests, in his concurring opinion, that law students might provide an important source of legal representation. He presents no figures, however, as to how many students would be qualified and willing to undertake the responsibilities of defending indigent misdemeanants. Although welcome progress is being made with programs, supported by the American Bar Association, to enlist the involvement of law students in indigent representation, the problems of meeting state requirements and of assuring the requisite control and supervision, are far from insubstantial. Moreover, the impact of student participation would be limited primarily to the 140 or less communities where these law schools are located.

occasional misdemeanor appointment with the crowded calendars of lower courts in which cases are not scheduled weeks in advance but instead are frequently tried the day after arrest. Finally, the majority's focus on aggregate figures ignores the heart of the problem, which is the distribution and availability of lawyers, especially in the hundreds of small localities across the country.

Perhaps the most serious potential impact of today's holding will be on our already overburdened local courts.[22] The primary cause of "assembly line" justice is a volume of cases far in excess of the capacity of the system to handle efficiently and fairly. Tne Court's rule may well exacerbate delay and congestion in these courts. We are familiar with the common tactic of counsel of exhausting every possible legal avenue, often without due regard to its probable payoff. In some cases this may be the lawyer's duty; in other cases it will be done for purposes of delay.[23] The absence of direct economic impact on the client, plus the omnipresent ineffective-assistance-of-counsel claim, frequently produces a decision to litigate every issue. It is likely that young lawyers, fresh out of law school, will receive most of the appointments in petty-offense cases. The admirable zeal of these lawyers; their eagerness to make a reputation; the time their not yet crowded schedules permit them to devote to relatively minor legal problems; their desire for courtroom exposure; the availability in some cases of hourly fees, lucrative to the novice; and the recent constitutional explosion in procedural rights for the accused—all these factors are likely to result in the stretch-

[22] See generally H. James, Crisis in the Courts, c. 2 (1968); Challenge, *supra*, n. 13, at 145–156.

[23] See, *e. g.*, James, *supra*, n. 22, at 27–30; Schrag, On Her Majesty's Secret Service: Protecting the Consumer in New York City, 80 Yale L. J. 1529 (1971).

ing out of the process with consequent increased costs to the public and added delay and congestion in the courts.[24]

There is an additional problem. The ability of various States and localities to furnish counsel varies widely. Even if there were adequate resources on a national basis, the uneven distribution of these resources—of lawyers, of facilities, and available funding—presents the most acute problem. A number of state courts have considered the question before the Court in this case, and have been compelled to confront these realities. Many have concluded that the indigent's right to appointed counsel does not extend to all misdemeanor cases. In reaching this conclusion, the state courts have drawn the right-to-counsel line in different places, and most have acknowledged that they were moved to do so, at least in part, by the impracticality of going further.[25]

[24] In Cook County, Illinois, a recent study revealed that the members of the Chicago Bar Association's Committee on the Defense of Prisoners who are appointed to represent indigent defendants elect a jury trial in 63% of their trial cases, while other appointed counsel and retained counsel do so in 33% and the public defender in only 15%. "One possible explanation for this contrast is that committee counsel, who are sometimes serving in part to gain experience, are more willing to undertake a jury trial than is an assistant public defender, who is very busy and very conscious of the probable extra penalty accruing to a defendant who loses his case before a jury." D. Oaks & W. Lehman, A Criminal Justice System and the Indigent 159 (1968) (footnote omitted).

[25] See *Irvin* v. *State*, 44 Ala. App. 101, 203 So. 2d 283 (1967); *Burrage* v. *Superior Court*, 105 Ariz. 53, 459 P. 2d 313 (1969); *Cableton* v. *State*, 243 Ark. 351, 420 S. W. 2d 534 (1967); *State ex rel. Argersinger* v. *Hamlin*, 236 So. 2d 442 (Fla. 1970); *People* v. *Dupree*, 42 Ill. 2d 249, 246 N. E. 2d 281 (1969); *People* v. *Mallory*, 378 Mich. 538, 147 N. W. 2d 66 (1967); *Hendrix* v. *City of Seattle*, 76 Wash. 2d 142, 456 P. 2d 696 (1969), cert. denied, 397 U. S. 948 (1970); *State ex rel. Plutschack* v. *Department of Health and Social Services*, 37 Wis. 2d 713, 155 N. W. 2d 549 (1968).

In other States, legislatures and courts through the enactment of laws or rules 'have drawn the line short of that adopted by the majority.[26]  These cases and statutes reflect the judgment of the courts and legislatures of many States, which understand the problems of local judicial systems better than this Court, that the rule announced by the Court today may seriously overtax capabilities.[27]

The papers filed in a recent petition to this Court for a writ of certiorari serve as an example of what today's ruling will mean in some localities.  In November 1971 the petition in Wright v. Town of Wood, No. 71–5722, was filed with this Court.  The case, arising out of a South Dakota police magistrate court conviction for the municipal offense of public intoxication, raises the same issues before us in this case.  The Court requested that the town of Wood file a response.  On March 8, 1972, a lawyer occasionally employed by the town filed with the clerk an affidavit explaining why the town had not responded.  He explained that Wood, South Dakota.

---

[26] See Hawaii Const., Art. I, § 11 (1968); Idaho Code §§ 19–851, 19–852 (Supp. 1971); Kan. Stat. Ann. § 22–4503 (Supp. 1971); Ky. Rule Crim. Proc. 8.04; La. Rev. Stat. § 15:141 (F) (1967); Me. Rule Crim. Proc. 44; Md. Rule 719b2 (a); Neb. Rev. Stat. § 29–1803 (1964); Nev. Rev. Stat. §§ 171.188, 193.140 (1969); N. Mex. Stat. Ann. § 41–22–3 (Supp. 1971); Utah Code Ann. § 77–64–2 (Supp. 1971); Vt. Stat. Ann., Tit. 13, § 6503 (Supp. 1971); Va. Code Ann. § 19.1–241.1 (Supp. 1971).

[27] See Kamisar & Choper, The Right to Counsel in Minnesota: Some Field Findings and Legal-Policy Observations, 48 Minn. L. Rev. 1, 68 (1963). Local judges interviewed by the authors concluded that the right to counsel should not be extended to petty cases. "If no such dividing line can be drawn, if the question of assigned counsel in misdemeanor cases resolves itself into an 'all or nothing' proposition,' then, the thrust of their views was that limited funds and lawyer-manpower and the need for judicial economy dictate that it be 'nothing.'" (Footnote omitted.)  But see State v. Borst, 278 Minn. 388, 154 N. W. 2d 888 (1967).

has a population of 132, that it has no sewer or water system and is quite poor, that the office of the nearest lawyer is in a town 40 miles away, and that the town had decided that contesting this case would be an unwise allocation of its limited resources.

Though undoubtedly smaller than most, Wood is not dissimilar to hundreds of communities in the United States with no or very few lawyers, with meager financial resources, but with the need to have some sort of local court system to deal with minor offenses.[28] It is quite common for the more numerous petty offenses in such towns to be tried by local courts or magistrates while the more serious offenses are tried in a county-wide court located in the county seat.[29] It is undoubtedly true that some injustices result from the informal procedures of these local courts when counsel is not furnished; certainly counsel should be furnished to some indigents in some cases. But to require that counsel be furnished virtually every indigent charged with an imprisonable offense would be a practical impossibility for many small town courts. The community could simply not enforce its own laws.[30]

---

[28] See *Cableton* v. *State,* 243 Ark., at 358, 420 S. W. 2d, at 538–539: "[T]here are more justices of the peace in Arkansas than there are resident practicing lawyers and . . . there are counties in which there are no practicing lawyers. The impact of [right to counsel in misdemeanor cases] would seriously impair the administration of justice in Arkansas and impose an intolerable burden upon the legal profession." (Footnote omitted.)

[29] See Silverstein, *supra,* n. 9, at 125–126.

[30] The successful implementation of the majority's rule would require state and local governments to appropriate considerable funds, something they have not been willing to do. Three States with 21% of the Nation's population provide more than 50% of all state appropriations for indigent defense. Note, Dollars and Sense of an Expanded Right to Counsel, 55 Iowa L. Rev. 1249, 1265 (1970). For example, in 1971 the State of Kansas spent $570,000

Perhaps it will be said that I give undue weight both to the likelihood of short-term "chaos" and to the possibility of long-term adverse effects on the system. The answer may be given that if the Constitution requires the rule announced by the majority, the consequences are immaterial. If I were satisfied that the guarantee of due process required the assistance of counsel in every case in which a jail sentence is imposed or that the only workable method of insuring justice is to adopt the majority's rule, I would not hesitate to join the Court's opinion despite my misgivings as to its effect upon the administration of justice. But in addition to the resulting problems of availability of counsel, of costs, and especially of intolerable delay in an already overburdened system, the majority's drawing of a new inflexible rule may raise more Fourteenth Amendment problems than it resolves. Although the Court's opinion does not deal explicitly with any sentence other than deprivation of liberty however brief, the according of special constitutional status to cases where such a sentence is imposed may derogate from the need for counsel in other types of cases, unless the Court embraces an even broader prophylactic rule. Due process requires a fair trial in all cases. Neither the six-month rule approved below nor the rule today enunciated by the Court is likely to achieve this result.

defending indigents in felony cases—up from $376,000 in 1969. Although the budgetary request for 1972 was $612,000, the legislature has appropriated only $400,000. Brief for Appellant in *James* v. *Strange,* No. 71–11, decided today, *post,* p. 128. "In view of American resources the funds spent on the legal services program can only be regarded as trivial." Cappelletti, *supra,* n. 21, at 379. "Although the American economy is over 8 times the size of the British and the American population is almost 4 times as great, American legal aid expenditures are less than 2 times as high." *Id.,* at 379 n. 210.

## III

I would hold that the right to counsel in petty-offense cases is not absolute but is one to be determined by the trial courts exercising a judicial discretion on a case-by-case basis.[31] The determination should be made before the accused formally pleads; many petty cases are resolved by guilty pleas in which the assistance of counsel may be required.[32] If the trial court should conclude that the assistance of counsel is not required in any case, it should state its reasons so that the issue could be preserved for review. The trial court would then become obligated to scrutinize carefully the subsequent proceedings for the protection of the defendant. If an unrepresented defendant sought to enter a plea of guilty, the Court should examine the case against him to insure that there is admissible evidence tending to support the elements of the offense. If a case went to trial without defense counsel, the court should intervene, when necessary, to insure that the defendant adequately brings out the facts in his favor and to prevent legal issues from being overlooked. Formal trial rules should not be applied strictly against unrepresented defendants. Finally, appellate

---

[31] It seems to me that such an individualized rule, unlike a six-month rule and the majority's rule, does not present equal protection problems under this Court's decisions in *Griffin* v. *Illinois,* 351 U. S. 12 (1956); *Douglas* v. *California,* 372 U. S. 353 (1963); and *Mayer* v. *City of Chicago,* 404 U. S. 189 (1971).

[32] See, *e. g.,* Katz, Municipal Courts—Another Urban Ill, 20 Case Western Reserve L. Rev. 87, 92–96 (1968). Cf. *Hamilton* v. *Alabama,* 368 U. S. 52 (1961); *White* v. *Maryland,* 373 U. S. 59 (1963); *Harvey* v. *Mississippi,* 340 F. 2d 263 (CA5 1965).

Although there is less plea negotiating in petty cases, see n. 13, *supra,* the assistance of counsel may still be needed so that the defendant who is not faced with overwhelming evidence of guilt can make an intelligent decision whether to go to trial.

courts should carefully scrutinize all decisions not to appoint counsel and the proceedings which follow.

It is impossible, as well as unwise, to create a precise and detailed set of guidelines for judges to follow in determining whether the appointment of counsel is necessary to assure a fair trial. Certainly three general factors should be weighed. First, the court should consider the complexity of the offense charged. For example, charges of traffic law infractions would rarely present complex legal or factual questions, but charges that contain difficult intent elements or which raise collateral legal questions, such as search-and-seizure problems, would usually be too complex for an unassisted layman. If the offense were one where the State is represented by counsel and where most defendants who can afford to do so obtain counsel, there would be a strong indication that the indigent also needs the assistance of counsel.

Second, the court should consider the probable sentence that will follow if a conviction is obtained. The more serious the likely consequences, the greater is the probability that a lawyer should be appointed. As noted in Part I above, imprisonment is not the only serious consequence the court should consider.

Third, the court should consider the individual factors peculiar to each case. These, of course, would be the most difficult to anticipate. One relevant factor would be the competency of the individual defendant to present his own case. The attitude of the community toward a particular defendant or particular incident would be another consideration. But there might be other reasons why a defendant would have a peculiar need for a lawyer which would compel the appointment of counsel in a case where the court would normally think this unnecessary. Obviously, the sensitivity and diligence of individual judges would be crucial to the operation of a rule of fundamental fairness requiring the consideration of the varying factors in each case.

Such a rule is similar in certain respects to the special-circumstances rule applied to felony cases in *Betts* v. *Brady*, 316 U. S. 455 (1942), and *Bute* v. *Illinois*, 333 U. S. 640 (1948), which this Court overruled in *Gideon*.[33] One of the reasons for seeking a more definitive standard in felony cases was the failure of many state courts to live up to their responsibilities in determining on a case-by-case basis whether counsel should be appointed. See the concurring opinion of Mr. Justice Harlan in *Gideon*, 372 U. S., at 350–351. But this Court should not assume that the past insensitivity of some state courts to the rights of defendants will continue. Certainly if the Court follows the course of reading rigid rules into the Constitution, so that the state courts will be unable to exercise judicial discretion within the limits of funda-mental fairness, there is little reason to think that in-sensitivity will abate.

In concluding, I emphasize my long-held conviction that the adversary system functions best and most fairly only when all parties are represented by competent counsel. Before becoming a member of this Court, I participated in efforts to enlarge and extend the avail-ability of counsel. The correct disposition of this case, therefore, has been a matter of considerable concern to me—as it has to the other members of the Court. We are all strongly drawn to the ideal of extending the right to counsel, but I differ as to two fundamentals: (i) what the Constitution *requires,* and (ii) the effect upon the criminal justice system, especially in the smaller cities and the thousands of police, municipal, and justice of the peace courts across the country.

The view I have expressed in this opinion would accord considerable discretion to the courts, and would allow the

---

[33] I do not disagree with the overruling of *Betts;* I am in complete accord with *Gideon*. *Betts,* like *Gideon*, concerned the right to counsel in a felony case. See n. 1, *supra.* Neither case controls today's result.

flexibility and opportunity for adjustment which seems so necessary when we are imposing new doctrine on the lowest level of courts of 50 States. Although this view would not precipitate the "chaos" predicted by the Solicitor General as the probable result of the Court's absolutist rule, there would still remain serious practical problems resulting from the expansion of indigents' rights to counsel in petty-offense cases.[34] But the according of reviewable discretion to the courts in determining when counsel is necessary for a fair trial, rather than mandating a completely inflexible rule, would facilitate an orderly transition to a far wider availability and use of defense counsel.

In this process, the courts of first instance which decide these cases would have to recognize a duty to consider the need for counsel in every case where the defendant faces a significant penalty. The factors mentioned above, and such standards or guidelines to assure fairness as might be prescribed in each jurisdiction by legislation or rule of court, should be considered where relevant. The goal should be, in accord with the essence of the adversary system, to expand as rapidly as practicable the availability of counsel so that no person accused of crime must stand alone if counsel is needed.

As the proceedings in the courts below were not in accord with the views expressed above, I concur in the result of the decision in this case.

---

[34] Indeed, it is recognized that many of the problems identified in this opinion will result from any raising of the standards as to the requirement of counsel. It is my view that relying upon judicial discretion to assure fair trial of petty offenses not only comports with the Constitution but will minimize problems which otherwise could affect adversely the administration of criminal justice in the very courts which already are under the most severe strain.