COMMONWEALTH *vs.* JAMES W. BARRETT.

Suffolk.    March 19, 1974. — January 23, 1975.

Present: ROSE, GOODMAN, & GRANT, JJ.

*Evidence,* Other offense.  *Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Assistance of counsel.

Review of authorities on types of criminal cases requiring appointment of counsel for indigent defendants. [9-16]
At a murder trial introduction to impeach the defendant's credibility of three assault and battery convictions resulting from previous trials at which the defendant had been without counsel and which, in the circumstances, may well have contributed to his conviction of second degree murder was reversible error. [16-18]

MOTIONS for a new trial filed in the Superior Court on April 24, 1972, and August 14, 1973, respectively.
The proceedings were heard by *Beaudreau*, J.
*John G. S. Flym* for the defendant.
*Elizabeth C. Casey*, Assistant District Attorney, for the Commonwealth.

GOODMAN, J.   These are appeals (G. L. c. 278, §§ 33A-33G) from the denials of the defendant's two motions for a new trial. The defendant, in 1963, was indicted for and convicted of second degree murder.[1] No appeal was taken. In 1972, the defendant filed a motion for a new trial, which was denied. The motion alleged among other grounds that

---

[1] The defendant's indictment for unlawfully carrying a firearm (on which he was also found guilty) was placed on file. *Commonwealth* v. *Houston*, 2 Mass. App. Ct. 845 (1974). Further, the defendant's briefs are not directed to that indictment.

Commonwealth *v.* Barrett.

convictions resulting from previous trials at which the defendant had been without counsel had been unconstitutionally used at the trial to impeach the defendant's credibility; he had testified on his own behalf that he had shot the victim in self-defense. Subsequently, in 1973 the defendant filed a "renewed motion for a new trial." The motion reiterated and expanded the ground that the uncounseled convictions had been unconstitutionally used and added a number of other grounds. This also was denied.

We hold that a new trial is required because the Commonwealth introduced in evidence to impeach the defendant's credibility three convictions for assault and battery, viz.: One in the District Court of Chelsea was on May 7, 1956; the defendant pleaded guilty and was fined $50. A second in the Municipal Court of the City of Boston was on December 19, 1959; the defendant was tried, found guilty, and fined $100. A third in the Municipal Court of the City of Boston was on April 4, 1961; the defendant was tried, found guilty, and fined $15.[2] Our conclusion is based on (1) the implications of *Loper* v. *Beto,* 405 U. S. 473 (1972), and of *Argersinger* v. *Hamlin,* 407 U. S. 25 (1972), and related cases and (2) on an examination of the transcript, from which it appears that the uncounseled convictions of assault and battery may well have contributed to the conviction in this case in which the defendant was sentenced to life imprisonment.

1. In *Loper* v. *Beto,* 405 U. S. 473, 480, 485 (1972), the majority of the court answered in the affirmative the ques-

---

[2] The defendant's conviction for burglary in 1959 was also introduced to impeach his credibility. We accept the express findings of the judge that the defendant was represented by counsel when he pleaded guilty and was sentenced in that case. The trial judge could choose to rely on the docket entries and the papers in the case, which indicated that defense counsel had filed an appearance for the defendant on the date he pleaded guilty, rather than on an affidavit in which the affiant stated "special reasons . . . [he] would [have] remember[ed]" the appearance of the defendant's attorney, about fourteen years previously, or on the defendant's testimony at the hearing on the motion. The attorney had no recollection or records of the matter. See *Gilday* v. *Commonwealth,* 355 Mass. 799 (1969); *Commonwealth* v. *Boudreau,* 362 Mass. 378, 381-382 (1972); *Commonwealth* v. *Brown,* 2 Mass. App. Ct. 76, 82 (1974).

tion: "Does the use of prior, void convictions for impeach-
ment purposes deprive a criminal defendant of due process
of law where their use might well have influenced the out-
come of the case?" The plurality opinion, at 483[3], quoting
from *Gilday* v. *Scafati*, 428 F. 2d 1027, 1029 (1st Cir. 1970),
cert. den. 400 U. S. 926 (1970), said, "We can put the mat-
ter no better than in the words of the Court of Appeals for
the First Circuit: '... The absence of counsel impairs the
reliability of such convictions just as much when used to
impeach as when used as direct proof of guilt.' " The *Loper*
case thus follows from the principle established in *Gideon*
v. *Wainwright*, 372 U. S. 335 (1963), that the requirement
of counsel "goes to 'the very integrity of the fact-finding
process' in criminal trials, and that a conviction obtained
after a trial in which the defendant was denied the assis-
tance of a lawyer 'lacked reliability.' " *Loper* v. *Beto, supra*,
at 483-484, quoting, at 484, *Linkletter* v. *Walker*, 381 U. S.
618, 639, and fn. 20 (1965). Compare *Subilosky* v. *Com-
monwealth*, 349 Mass. 484, 488 (1965), holding the *Gideon*
case retroactive because "[t]he [uncounseled] judgments
lack reliability and this is just as true whether the defend-
ant was convicted before or after the decision in the *Gideon*
case."

Such a conviction, lacking in reliability, cannot (con-
sistently with *Burgett* v. *Texas*, 389 U. S. 109, 115 [1967])
be used "either to support guilt" (*Loper* case, at 481, quot-
ing the *Burgett* case, *supra*) — "the obvious purpose and
likely effect of impeaching the defendant's credibility" (*Lo-
per* case, at 483, quoting *Gilday* v. *Scafati*, 428 F. 2d at
1029) — or (consistently with *United States* v. *Tucker*,
404 U. S. 443 [1972]) "play[ ] a part in the determina-
tion of the length of a convicted defendant's prison sen-
tence" (*Loper* case, at 482). See *Commonwealth* v. *Barrett*,
1 Mass. App. Ct. 332, 334-337 (1973).

In *Argersinger* v. *Hamlin*, 407 U. S. at 32, the Supreme
Court of the United States held that the rationale of the

---

[3] Mr. Justice White's concurrence would seem merely to emphasize
the issues which might be raised on remand to the Court of Appeals.

*Gideon* case "has relevance to any criminal trial, where an accused is deprived of his liberty" and held void an uncounseled conviction of an offense punishable by imprisonment up to six months or a fine of $1,000, for which the petitioner was sentenced to ninety days in jail. The court went on to say, "We need not consider the requirements of the Sixth Amendment as regards the right to counsel where loss of liberty is not involved, however, for here petitioner was in fact sentenced to jail." *Argersinger* v. *Hamlin, supra,* at 37. This was in reply to Mr. Justice Powell's concurring opinion arguing that the need for counsel cannot, under the rationale of *Powell* v. *Alabama,* 287 U. S. 45, 68-69 (1932), and *Gideon* v. *Wainwright,* 372 U. S. at 343-345, depend on whether imprisonment results. He points out (p. 48) that "[s]erious consequences also may result from convictions not punishable by imprisonment" and predicts (p. 51) that "[t]he thrust of the Court's position indicates, however, that when a decision must be made, the rule will be extended to all petty-offense cases except perhaps the most minor traffic violations."

We need not in this case attempt to anticipate just what distinctions will ultimately be developed. See *United States* v. *Sawaya,* 486 F. 2d 890, 892, and fn. 2 (1st Cir. 1973), discussing various possibilities and citing cases. See also *Wood* v. *Superintendent Caroline Correctional Unit,* 355 F. Supp. 338, 341-344 (E. D. Va. 1973); Note, 35 Ohio St. L. J. 168, 170-176 (1974). But it is perhaps significant that after the decision in the *Gideon* case, decided March 18, 1963, the Supreme Judicial Court in *Commonweath* v. *O'Leary,* 347 Mass. 387, 390 (decided April 29, 1964), admonished, in view of the possible implications of the *Gideon* case and related decisions by the Supreme Court of the United States, that "it would be wise [at a trial in a District Court] to offer to appoint counsel except for the most trifling of offences for which no sentence of imprisonment may be imposed." The *O'Leary* case, moreover, was decided at a time when Rule 10 of the General Rules of the Supreme Judicial Court (345 Mass. 792; effective December 21, 1962) provided for appointment of counsel for an in-

digent defendant "charged with a noncapital felony." In-
deed, soon thereafter, on June 29, 1964, Rule 10[4] was
changed so that it has since provided for the assignment of
counsel for an indigent defendant "charged with a crime,
for which a sentence of imprisonment may be imposed . . .."
347 Mass. 809 (1964). Compare *Olvera* v. *Beto,* 429 F. 2d
131, 132 (5th Cir. 1970); *Gilliard* v. *Carson,* 348 F. Supp.
757, 762-763 (M. D. Fla. 1972).

This indication that the classification in Rule 10 may
represent the view of the Supreme Judicial Court as to
the ultimate scope of the *Gideon* case (but see *MacDonnel*
v. *Commonwealth,* 353 Mass. 277, 280 [1967]) is reinforced
in *Williams* v. *Commonwealth,* 350 Mass. 732, 733-734
(1966), in which an indigent defendant without counsel
pleaded guilty in a Municipal Court to five complaints,
"some of which were sufficiently serious to have resulted in
the confinement of the petitioner." They were placed on
file without fine or sentence of imprisonment. The court
said (p. 734), "In these proceedings the petitioner [defend-
ant] was entitled to be represented by counsel" and cited
*Gideon* v. *Wainwright,* while referring also to Rule 10.
Similarly, in applying its Rule 3:10, 351 Mass. 791 (1967),
the Supreme Judicial Court held in *Cardran* v. *Common-
wealth,* 356 Mass. 351, 353-354 (1969), that a defendant
appearing without counsel in a District Court to withdraw
an appeal to the Superior Court was entitled to counsel,
though he had only been fined in the District Court. The
court pointed out that "[i]n one of the complaints the peti-
tioner was charged with an offence 'for which a sentence
of imprisonment may be imposed.' G. L. c. 90, § 24 (1) (a)."
As in *Williams* v. *Commonwealth, supra,* the court was con-
cerned with the classification of the offense rather than the
outcome of the particular case.[5]

---

[4] Renumbered 3:10, effective June 1, 1967, 351 Mass. 731 (1967).

[5] While we have looked to Rule 3:10 and its predecessor as admin-
istered by the Supreme Judicial Court for guidance in attempting to
determine the reach of the constitutional entitlement to counsel, we
have not based our decision on the rule because we are doubtful of the
extent to which it might be held retroactive. Nor has either party men-

A somewhat different classification is recommended in the American Bar Association Project on Standards for Criminal Justice, Standards Relating to Providing Defense Services, § 4.1, pp. 37-38 (Approved Draft, 1968), which was quoted by Chief Justice Burger, concurring in *Argersinger* v. *Hamlin*, 407 U. S. at 43. These standards state: "Counsel should be provided in all criminal proceedings for offenses punishable by loss of liberty, except those types of offenses for which such punishment is not likely to be imposed, regardless of their denomination as felonies, misdemeanors or otherwise." The commentary on those standards, quoted by the majority in the *Argersinger* case, states, "It should be noted that the standard does not recommend a determination of the need for counsel in terms of the facts of each particular case; it draws a categorical line at those *types* of offenses for which incarceration as a punishment is a practical possibility" (emphasis in original). Similarly, in the Report by the President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society, 150 (1967), it was recommended that counsel be provided "to every criminal defendant who faces a significant penalty...." Under any of these formulations, or the formulation in Rule 3:10, the assignment of counsel would be required in cases of assault and battery, which carries a possible penalty of two and one-half years in a house of correction or a $500 fine. G. L. c. 265, § 13A. Indeed, in attempting to estimate the need for lawyers in misdemeanor cases, the Task Force Report: The Courts (Task Force on Administration of Justice, The President's Commission on Law Enforcement and Administration of Justice) 55 (1967), classes among those offenses as to which the need is greatest "[s]ome misdemeanor cases, such as simple assault and

---

tioned the rule. Moreover, the retroactivity of *Gideon* v. *Wainwright*, 372 U. S. 335 (1963), *Loper* v. *Beto*, 405 U. S. 473 (1972), and *Argersinger* v. *Hamlin*, 407 U. S. 25 (1972) (see *Berry* v. *Cincinnati*, 414 U. S. 29 [1973]) is clear. See generally *School Comm. of Springfield* v. *Board of Educ.* 366 Mass. 315, 339-350 (1974) (Tauro, C.J., addendum).

petty larceny, [which] are less serious counterparts of felonies. . . . They may present legal or factual issues as difficult as their comparable felony offenses, and the result of conviction may be incarceration for as long as a year or a substantial fine."

However, even if we take the view — for which some justification can be found in the *Argersinger* case — that an unconstitutional deprivation of counsel occurs only where the consequence of the proceeding is imprisonment, we still conclude on the record in this case that the uncounseled assault and battery convictions were used to "support guilt" (*Loper* v. *Beto*, 405 U. S. at 481, quoting *Burgett* v. *Texas*, 389 U. S. at 115) in a proceeding which resulted in imprisonment, indeed in life imprisonment, as provided in G. L. c. 265, § 2.[6] That the imprisonment may in a somewhat technical sense be termed collateral does not seem to us of importance. As was said in Note, Ohio St. L. J. 168, 183-184 (1974), of the "approach [which] would prohibit the collateral use of misdemeanor convictions of uncounseled indigents who were not imprisoned . . . [i]t would subvert the Court's purpose to allow imprisonment to result indirectly from uncounseled misdemeanor trials . . . . Since the Court prohibited imprisonment based upon an unreliable conviction obtained at an unfair trial, the Court would probably not permit unreliable trials to have a delayed impact resulting in imprisonment."

The consideration of collateral consequences in charting the scope of procedural safeguards required by the Constitution or otherwise is not an unfamiliar practice. Thus, e. g., in *Mayer* v. *Chicago*, 404 U. S. 189 (1971), the court held that an indigent defendant who was convicted of violating two city ordinances, each carrying a maximum fine of $500, and who was fined $250 for each violation was entitled free of charge to a record adequate for appellate review. The court pointed out that even if it were material, as the respondent contended, that the penalty was only a

---

[6] As previously indicated, we need not anticipate a case in which the trial judge has discretion to impose only a fine and has exercised it.

fine, yet "[t]he practical effects of conviction of even petty offenses of the kind involved here are not to be minimized.... The collateral consequences of conviction may be even more serious ...." *Id.* at 197. See *Sibron* v. *New York,* 392 U. S. 40, 55 (1968); *Matthews* v. *Florida,* 463 F. 2d 679, 681 (5th Cir. 1972); Note, 88 Harv. L. Rev. 373, 381 (1974).

The approach in this case has been taken in other jurisdictions and in somewhat analogous situations. For example, in *State* v. *Kirby,* 33 Ohio Misc. 48 (Ct. C. P. 1972), the court held that an uncounseled conviction of possession of a harmful intoxicant which resulted in a fine of $25 could not be used as one of the bases for a subsequent felony conviction of the same offense. The court said, citing the *Argersinger* and *Burgett* cases, "[W]hen an allegation of prior convictions of the misdemeanor ... is used to enhance punishment, it effectively becomes a 'serious offense' (here a felony) which requires [counsel or waiver] ... before it can be used in the subsequent prosecution." *State* v. *Kirby,* 33 Ohio Misc. at 51-52. See *United States* v. *Alderman,* 46 C. M. R. 298, 302-303 (1973); *Marston* v. *Oliver,* 485 F. 2d 705, 708 (4th Cir. 1973), cert. den. sub nom. *Marston* v. *State Farm Superintendent,* 417 U. S. 936 (1974) (dictum: "So far as its direct or collateral consequences are the loss of liberty on the part of the defendant, *Argersinger* applies.").

The same approach was followed in *State* v. *Reagan,* 103 Ariz. 287, 289 (1968), before the *Argersinger* case, when Arizona held that there was no requirement for counsel in the case of petty theft (not categorized as a "serious offense") but that "it effectively becomes a 'serious offense' which requires that the record of that prior conviction show that defendant was represented by counsel, or ... waived his right to counsel, before it can be used in the subsequent [felony] prosecution." See *Mure* v. *State,* 478 P. 2d 926, 928 (Okla. Crim. App. 1970). And in *People* v. *Brooks,* 16 Mich. App. 759, 761 (1969), the court held that a misdemeanor, which the Michigan courts had held did not require appointment of counsel, could not be used as

a basis for revocation of probation. Compare *Williams* v. *Commonwealth,* 350 Mass. at 734.[7]

2. Our examination of the transcript convinces us that the injection into this trial for second degree murder of the three assault and battery convictions might well have influenced the jury and contributed to the verdict. The defendant admitted on the witness stand that he shot the victim, one Poulos, in the doorway of a restaurant on Tremont Street in Boston. He testified that Poulos had initiated a homosexual relationship with him which had continued intermittently over the years. After he had refused to continue the relationship, he was told in May and the early part of June of 1963 by various people that Poulos had been looking for him and was threatening to kill him. "He had a gun and now he was getting very vicious and violent and drinking every day, going up and down Tremont and Shawmut Avenue looking for me."

On the evening of the shooting, the defendant had been in the South End, and as he was going home he saw Poulos in the doorway of a restaurant. He testified that Poulos "looked at me and said, 'Oh, you are just the one I'm looking for,' and he made a motion in his back pocket, pulled out something and came at me. And I froze, just froze, and I pulled the gun out and just kept firing at him." The defendant's companion described the shooting as follows: "He [Poulos] was standing there and he made a smirk. It was a mean look. . . . And then he motioned with his hands. His hands went back and he took a step or two steps — I'm not sure — towards Jimmy [the defendant]. And then right at that time, I heard shots fired." There was other testimony that, when shot, the victim had a brass cylinder in his hand which he usually carried with him as a weapon and which was known as a "little Herman."

Besides the defendant's companion, the defense had seven other witnesses, including the owner of a café in the

---

[7] Cases taking a contrary view are *Cottle* v. *Wainwright,* 477 F. 2d 269, 275 (5th Cir. 1973), vacated on other grounds 414 U. S. 895 (1973); *Aldrighetti* v. *State,* 507 S. W. 2d 770, 772 (Texas Crim. App. 1974); *State* v. *McGrew,* 127 N. J. Super. 327, 329-330 (1974).

area, the manager of another, and the proprietress of a variety store in the neighborhood, all of whom corroborated various aspects of the defendant's testimony. Some characterized Poulos as "violent" and "vicious," and testified that he had threatened to kill the defendant and that he had displayed a gun — threats which were communicated to the defendant. There was clearly sufficient evidence to permit the jury to consider both self-defense and voluntary manslaughter, and indeed the trial judge gave instructions on both.[8]

The Commonwealth countered with an attempt to show that the defendant also engaged in what the Commonwealth's brief characterizes as "contentious behavior," that he had attempted to emulate Poulos, and even carried a similar brass cylinder as a weapon. This attempt to establish, on cross-examination, that the defendant also had a propensity for fighting was not particularly successful.[9] There was similar cross-examination of the manager of a café. The Commonwealth attempted to elicit: that "[y]ou have seen Jimmy Barrett in fights, haven't you?" and that "if someone attacked either one of the two [Barrett or Poulos], they would stand back to back?" The witness replied that he had heard that, but he had never seen it and that "[t]he only time [he had] . . . ever seen Jimmy fighting was with [Poulos]."

The assault and battery convictions indicated a predisposition to violence of the same general nature, though

---

[8] This is not to say that there was not sufficient evidence of second degree murder; our examination of the transcript indicates that there was.

[9] One defense witness, the owner of a café, was cross-examined as follows:

Q. (by the prosecuting attorney) "And I suppose you knew Steve as a vicious fellow, too?"

A. "Yes, a fighter."

Q. "What about Jimmy Barrett; did you ever see him in fights?"

A. "No, sir, I never did."

Q. "Did you ever see him with a Little Herman of his own or something of that nature?"

A. "No, sir."

different in degree, as the crime with which the defendant was charged. They clearly struck at the credibility of the defense and contributed to the Commonwealth's contention. Indeed, it might well be that the Commonwealth, in its closing, exploited these convictions for this purpose.[10] Under these circumstances a new trial is required. *Commonwealth* v. *Barrett,* 1 Mass. App. Ct. 332, 335-337 (1973). *Commonwealth* v. *Avery,* 1 Mass. App. Ct. 827 (1973). Compare *Howard* v. *Craven,* 446 F. 2d 586, 587 (9th Cir. 1971); *White* v. *State,* 11 Md. App. 423, 433 (1971); *People* v. *Sanders,* 43 Mich. App. 698, 708-709 (1972).

The defendant makes a number of other contentions. Apart from those we have noted in passing, we do not deal with them. Many of them will probably not recur at a new trial, and in connection with those that may, it seems likely that the course of a new trial may be so different that any further discussion would not be helpful.

*Orders denying motions for
a new trial reversed.*

*Judgment reversed.*

*Verdict set aside.*

---

[10] The closing argument was not recorded, but a present member of the bar, who was a spectator at the trial when the prosecutor made his closing argument to the jury, stated in an affidavit, "I further remember that . . . [the prosecuting attorney] repeatedly referred to certain prior convictions of the defendant, arguing not only that the defendant's credibility was in question, but also stressing that three of those convictions were for crimes of violence, assault and battery offenses, and that this evidence of past violence made it reasonable to infer that the defendant had acted intentionally and with malice in the homicide of Steven Poulos."