STATE OF NORTH CAROLINA,
v.
DENNIS RAY CECIL.
No. COA09-724.
Court of Appeals of North Carolina.
Filed: February 16, 2010.
This case not for publication
Attorney General Roy Cooper, by Special Deputy Attorney General Victoria L. Voight, for the State.
Kevin P. Bradley for Defendant.
STEPHENS, Judge.

I. Background
On 24 October 2007, Defendant was arrested and charged with felonious assault inflicting serious bodily injury and felonious assault by strangulation (07 CRS 104762). On 12 February 2008, Defendant was indicted on these same two charges. On 10 March 2008, Defendant was indicted for having obtained the status of habitual felon (08 CRS 23034).
On 4 August 2008, Defendant was indicted for misdemeanor assault on a female and felonious habitual misdemeanor assault (08 CRS 23190). On that same date, a second habitual felon indictment was issued against Defendant (08 CRS 23189).
On 2 September 2008, superceding indictments were issued on both habitual felon charges (08 CRS 23034 and 08 CRS 23189). On 15 October 2008, a superceding information was filed for the charges of misdemeanor assault on a female and felonious habitual misdemeanor assault (08 CRS 23190).
Defendant was tried on the substantive assault charges (07 CRS 104762 and 08 CRS 23190) at the 13 October 2008 criminal session of the Guilford County Superior Court. Defendant entered a provisional plea of guilty to the charge of habitual misdemeanor assault (08 CRS 23190), and the State dismissed the charge of felonious assault inflicting serious bodily injury (07 CRS 104762).
On 15 October 2008, Defendant was found guilty of felonious assault by strangulation (07 CRS 104762) and assault on a female (08 CRS 23190). Also on that date, Defendant pled guilty to having attained habitual felon status (08 CRS 23034 and 08 CRS 23189). The trial court entered judgment on the jury verdict.
On the offense of assault by strangulation (07 CRS 104762), Defendant was sentenced as an habitual felon to 151 to 191 months in prison and given credit for 266 days spent in confinement prior to the date of the judgment. On the offenses of assault on a female (08 CRS 23189) and habitual misdemeanor assault (08 CRS 23190), Defendant was sentenced as an habitual felon to a concurrent sentence of 151 to 191 months in prison and given credit for zero days spent in confinement prior to the date of the judgment. From these judgments, Defendant appeals.

II. Evidence
At trial, the State introduced evidence tending to show the following: In October of 2007, Laura Ann Baker, a 45-year-old female, was living in a homeless shelter in High Point, North Carolina when she met Defendant "on the street[.]" She subsequently moved into Defendant's home with him and stayed there for about three weeks. During this time, Baker and Defendant, who were unemployed, drank alcohol and used crack cocaine. Defendant kept Baker locked up, beat her, and threatened to kill her. On or about 22 October 2007, Defendant kicked and punched Baker so severely that he broke several of her ribs. On or about 23 October 2007, Defendant tried to strangle Baker because she would not have sex with him. On or about 24 October 2007, Baker was able to persuade Defendant to take her to the hospital. Defendant told Baker to say that she had been in a bicycle accident and had fallen down the stairs.
At the hospital, Baker was assessed by Nurse Deborah Galloway. Galloway noted that a man stayed in the examination room with Baker during the assessment. Baker had bruises and abrasions of different ages and severity, including facial and neck injuries and abrasions, abrasions and lacerations on one of her arms, and abrasions around her knees and lower extremities. When questioned about how her injuries had occurred, Baker said that she had fallen down some stairs several days before and had been in a bicycle accident prior to that. Galloway was suspicious about the cause of the injuries so when she took Baker for x-rays and they were alone, she asked Baker if the man in room had inflicted her injuries. Baker started to cry and said that he had. Baker asked Galloway not to report the injuries because she was afraid that Defendant would kill her. Galloway turned the matter over to Kendra Howard, a forensic nurse examiner.
Howard met with Baker while she was getting x-rays taken. At that time, Howard observed that Baker had multiple injuries including cuts on her arms, bruises on her face, bruising around her chin and neck area, and marks on her legs and arms. Some of the injuries looked like they might have been several days old. The x-rays that were taken showed rib fractures on Baker's right side. Baker admitted that the man she was with had done this to her but said that she didn't want to report it because she was afraid he would kill her. Baker eventually told Howard that while she was still afraid that Defendant would kill her, she wanted help. Howard called the police.
Officer K.C. Kish responded to Howard's call. When Baker saw Kish, she began crying and shaking. She covered her face and said, "he's going to kill me." Kish tried to calm Baker down and assure her that she was there to help, but Baker refused to talk to Kish. Kish called and requested assistance from Lieutenant Danny Turner. Kish again asked Baker to tell her what had happened. Baker told her that the previous night, Defendant had gotten her down on the kitchen floor and choked her until she blacked out and that she was afraid he was going to kill her.
When Turner arrived, Kish took photographs of Baker's injuries. The photographs were introduced into evidence at trial. After taking the photographs, Kish and Turner went back to the examining room and arrested Defendant. Turner took Defendant to the police station. Kish returned to Baker and Howard to tell them that it was now safe for Baker to return to the examining room. Kish asked Baker to prepare a written statement, and Baker agreed. The statement was introduced into evidence at trial. After Baker gave the statement, Kish offered to take Baker to a shelter or anywhere else she wanted to go. Baker, however, insisted upon returning to Defendant's house because she needed to collect her things and rest, which she couldn't do at the shelter.
Defendant introduced evidence which tended to show the following: On cross-examination, Baker admitted that prior to moving in with Defendant, she had been diagnosed with bipolar disorder. She also admitted to having prior criminal convictions, including one for possession of crack cocaine.
Kenneth Pope testified that he and Defendant were friends. During October 2007, he and Defendant were employed by a painting company and Pope would stop by Defendant's house to give him a ride to work. Pope was the person who drove Baker to the hospital. Pope testified that days before he took Baker to the hospital, he and his former girlfriend, Amy Hucks, were at Defendant's house when a "short black girl come in there and beat the crap out of [Baker.]" Pope testified that he thought that was the reason why Baker needed to go to the hospital.
Pope dropped Defendant and Baker off at the hospital and then went home. He expected them to call when they were ready to leave, but they never did. The following morning, Pope went by Defendant's house and found Baker there. Pope asked where Defendant was, and Baker replied that he was in jail as he had been arrested for beating her.
Pope testified that on several occasions during the period of time Baker was living at Defendant's house, Defendant asked her to leave. On at least one of those occasions, Hucks was there. Although Pope attempted to testify about statements that Hucks allegedly made to Baker, the State objected to the testimony, and those objections were sustained. Pope testified, without objection, that in response to Defendant's request that Baker leave, Hucks grabbed Baker by the arm and escorted her outside. A few minutes later, Baker returned to Defendant's house. Pope testified that while he had seen Defendant and Baker arguing, he had never seen either one make physical contact with the other.
Defendant's sister, Barbara Cecil, testified that she and her brother Tommy owned the house in which Defendant and Baker were living and that no one was supposed to be using the house without their permission. She further testified that about 10 days before Defendant was arrested, she was driving by the house and saw Baker on the front porch swing. Ms. Cecil parked her car and asked Baker what she was doing there. Baker said that she was waiting for Defendant and that she was going to "mess him up[.]" Ms. Cecil testified that she told Baker that she had to leave.
When Ms. Cecil learned that her brother had been arrested, she and her sister, Mary Cecil Williams, went to the house. They found Baker laying on the couch. Ms. Cecil shook Baker and told her that she had to leave. When Baker said that she wasn't going anywhere, Ms. Cecil pulled her off the couch by her shoulder. Baker then ran out the door. Baker later returned with the police, saying that she needed to get her belongings.
Ms. Williams, also Defendant's sister, testified that she was awakened by a call from the jail asking her to go check the house and feed Defendant's dog. Ms. Williams called her sister, Barbara Cecil, and asked her to come along. When they got to the house, they found Baker on the couch. They asked her to leave.
Johnny Everett Bullard, Defendant's friend, testified that up until several weeks before Defendant was arrested, he had been living with Defendant at the house. Bullard was homeless at the time but had a vehicle in which he and Defendant would drive around trying to find work. Bullard met Baker during visits to the house. Defendant was trying to get Baker to move out of the house, but she wouldn't do so. Defendant, Bullard, and Baker would drink and smoke crack cocaine with other people who visited the house. He saw Defendant and Baker argue but never saw them exchange blows and he never saw anyone hit Baker.

III. Discussion

A. Conflict of Interest
Defendant first argues that the trial court failed to adequately inquire into whether Defendant understandingly waived a conflict of interest of assigned defense counsel who had prosecuted one of the prior felony convictions used to establish Defendant's habitual felon status.
A criminal defendant subject to imprisonment has a Sixth Amendment right to assistance of counsel. Argersinger v. Hamlin, 407 U.S. 25, 37, 32 L. Ed. 2d 530, 538 (1972); State v. Mims, 180 N.C. App. 403, 409, 637 S.E.2d 244, 249 (2006). To be more than just a hollow right, our law requires that assistance of counsel be effective. Strickland v. Washington, 466 U.S. 668, 686, 80 L. Ed. 2d 674, 692, reh'g denied, 467 U.S. 1267, 82 L. Ed. 2d 864 (1984). There likewise exists a correlative right to "representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271, 67 L. Ed. 2d 220, 230 (1981). "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348, 64 L. Ed. 2d 333, 346-47 (1980).
At a hearing on 11 June 2008 regarding bail, defense counsel informed the trial court that he had prosecuted Defendant in the past. Defense counsel explained to the trial court that he had discussed this with Defendant "to make sure [Defendant] was okay with me representing him[,] and he said that he was." Defense counsel then requested that the trial court conduct a brief inquiry with Defendant concerning Defendant's desire to proceed with his appointed defense counsel. The trial court explained to Defendant that defense counsel was an excellent attorney, but that "it would still be your call as to whether or not you wanted [defense counsel] to represent you since he has prosecuted you in the past. So, we'll inquire on the record if that's what you want." Defendant expressed his desire to keep defense counsel, telling the court, "Thank you, Your Honor. I agree and concur with you on that. We've talked, discussed this, everything is okay." Following the trial, and prior to sentencing, the trial court asked Defendant, "Are you satisfied with your lawyer's legal services?" Defendant replied, "Yes, sir, Your Honor."
First, we are not convinced that "an actual conflict of interest" existed here based solely on defense counsel's prior prosecution of Defendant. Id. at 348, 64 L. Ed. 2d at 346; see State v. Childers, 645 S.E.2d 233 (S.C. 2007) (defendant failed to show defense counsel had conflict of interest based on defense counsel's prior prosecution of defendant); People v. Abar, N.Y.S.2d 155 (N.Y. App. Div. 3d Dep't 2002) (finding no conflict of interest where appointed defense counsel had previously prosecuted defendant on unrelated charges when defense counsel was employed as an assistant district attorney), aff'd 786 N.E.2d 1255 (N.Y.2d 2003); State v. Cobbs, 584 N.W.2d 709 (Wis. Ct. App. 1998) (concluding there was no actual or serious potential conflict where defendant's counsel had previously prosecuted defendant while working in the district attorney's office), disc. review denied, 589 N.W.2d 629 (Wis. 1998).
However, even assuming arguendo that an actual conflict did exist, Defendant has failed to show how counsel's performance was adversely affected by the alleged conflict. The only triable issue on an habitual felon indictment is whether the Defendant had, in fact, been convicted of the former felony offenses. See N.C. Gen. Stat. § 14-7.4 (2007). Defendant acknowledged at trial that he had pled guilty to and had been convicted of the prior felonies. Although Defendant now argues that defense counsel's alleged conflict of interest adversely affected his ability to advise Defendant regarding the decision to admit to the felony convictions, and advances a hypothetical conversation that could have occurred between Defendant and defense counsel as support for this contention, Defendant makes no argument suggesting that Defendant was not, in fact, convicted of those offenses. Thus, Defendant has failed to demonstrate that defense counsel's performance was adversely affected by his prior prosecution of Defendant. See State v. Bunch, 192 N.C. App. 724, 728, 666 S.E.2d 188, 190 (2008) (where counsel for defendant at his probation revocation hearing had been the prosecutor on the underlying felony for which defendant had been placed on probation two years earlier, this Court held that even "assuming arguendo that a conflict of interest did exist, defendant fail[ed] to show how counsel's performance at his probation violation hearing was adversely affected.").
Defendant nonetheless contends that the trial court's inquiry into any potential conflict was inadequate to determine that Defendant understandingly waived defense counsel's alleged conflict of interest. Relying on State v. Ballard, 180 N.C. App. 637, 638 S.E.2d 474 (2006), disc. review denied, 361 N.C. 358, 646 S.E.2d 119 (2007), Defendant specifically contends that the trial court failed to ensure that "[D]efendant [was] fully advised of the facts underlying the potential conflict and [was] given the opportunity to express his . . . views." Id. at 641, 638 S.E.2d at 478.
In Ballard, defense counsel learned that James Ellis Turner, III, whom defense counsel was currently representing on federal criminal charges, had "`credible, material, exculpatory information'" regarding defendant. Id. However, defense counsel could not call Turner as a witness for defendant because the testimony could implicate Turner in unrelated criminal offenses. As this "creat[ed] a clear conflict of interest[,]" id., defense counsel moved to withdraw from his representation of defendant and for a mistrial. Defendant did not want his counsel to withdraw, although he did want Turner to testify. Defendant told the court, "`I understand there's a conflict on legal matters that I really don't understand.'" Id. at 642, 638 S.E.2d at 478.
After a continuance, defense counsel again sought to withdraw, stating clearly that he would not call Turner to testify. The court stated: "`The [c]ourt hasn't prohibited you from calling this witness.'" Id. After further discussion, the trial court stated that "although the court has in no way prohibited [defense counsel] from calling [Turner]" as a witness, defense counsel was refusing to do so. Id. The court again asked defendant whether he wanted new counsel or a mistrial, and after defendant declined both, the court denied defense counsel's motions a final time. The trial then proceeded and neither side called Turner to testify.
On appeal, this Court stated that "[g]iven the [trial] court's repeated statements that it had not prohibited defense counsel from calling Turner . . . and the court's failure to make clear to defendant that if he kept his trial counsel, Turner would not be called to testify, it is apparent that defendant could have reasonably believed that he might keep his trial counsel without losing the right to Turner's testimony." Id. at 642, 638 S.E.2d at 478-79. Thus, this Court concluded that "[b]ecause the court failed to properly question and advise defendant on these matters, we cannot conclude that defendant waived his right to conflict-free representation knowingly, intelligently and voluntarily." Id. at 643, 638 S.E.2d at 479.
Here, while we are of the opinion that the trial court could have more fully advised Defendant of the facts underlying the potential conflict in this case, unlike in Ballard where a "clear conflict of interest" prohibited defense counsel from calling a witness with "`credible, material, exculpatory information'" regarding defendant, id. at 641, 638 S.E.2d at 478, and defendant readily admitted that he did not understand the legal conflict, in this case, Defendant has failed to show that any conflict, either alleged or actual, adversely affected his lawyer's performance. Moreover, unlike in Ballard, Defendant unequivocally stated that he had discussed the issue with his attorney and wanted to continue with his appointed defense counsel because "everything is okay." Thus, even if the trial court's inquiry into the conflict issue was inadequate, Defendant is not entitled to a new trial.
Defendant's argument is overruled.

B. Hearsay
Defendant next argues that the trial court erred in excluding testimony from a witness for Defendant as the testimony excluded was not hearsay.
Generally, "[i]n order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(b)(1). However, "[i]n criminal cases, a question which was not preserved by objection noted at trial and which is not deemed preserved by rule or law without any such action, nevertheless may be made the basis of an assignment of error where the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(c)(4).
In this case, the witness was questioned by defense counsel as follows:
[Defense Counsel:] Tell the jury about that.
[Witness:] Uh, me and Amy went over there one evening to visit Dennis, who at the same time this incident happened. Uh, Dennis had asked her several times to leave. He even got  threw up his hands in the air saying, Kenny, I don't know what to do. I've asked her to leave and she  I said I can't get involved in this. And Amy says  well, I get up 
[State:] Objection.
THE COURT: Sustained.
[Defense Counsel:] What did you observe Amy Hucks do?
[Witness:] Amy got up and says I'll get her out.
[State:] Objection to what she said, Judge.
THE COURT: Sustained. Don't tell us what Amy said, sir.
[Witness:] Okay. I was telling what I seen. I guess.
THE COURT: You can tell what you saw but you can't tell what you heard Amy say.
[Witness:] Okay. I got you.
[Defense Counsel:] Let me ask 
[Witness:] Uh, Amy 
[Defense Counsel:] Let me ask you another question to try and clarify it. As a result of anything that Amy said, what did you see her do and Laura Baker do?
. . . .
[Witness:] He said I don't know what to do. Amy said she'd take care of it.
THE COURT: You can't tell us what Amy said.
[Witness:] Amy took care of it.
[Defense Counsel:] What did Amy do?
[Witness:] Amy turned around and grabbed her by the arm and says come on. She says huh-uh. She says come on. She kept refusing. Amy says 
THE COURT: Sir, you cannot tell us what Amy said.
[Witness:] Okay. Amy grabbed her by the arm. Amy grabbed her by the arm, escorted her outside and told her not to come back in.
THE COURT: You can't tell us what Amy said.
[Witness:] Okay. Amy grabbed her by the arm. I saw this. Amy grabbed her by the arm and led her outside. I saw that.
Thus, although the State objected twice to the witness testifying as to what Amy said and the trial court sustained the State's objections, at no point did Defense counsel oppose the trial court's rulings or request that the testimony be admitted for purposes other than the truth of the matter asserted. Instead, as plainly appears from the exchange set out above, defense counsel acquiesced in the trial court's rulings. Furthermore, Defendant failed to specifically and distinctly contend on appeal that the exclusion of the testimony amounted to plain error. Accordingly, Defendant has failed to preserve this issue for appeal, thus precluding our review of the issue. N.C. R. App. P. 10(b)(1); N.C. R. App. P. 10(c)(4).

C. Time Served
By Defendant's final argument, he contends that the trial court erred in failing to give him credit for time served on his sentence for habitual misdemeanor assault (08 CRS 23190).
"In North Carolina, a defendant's right to appeal in a criminal proceeding is purely a creation of state statute." State v. Pimental, 153 N.C. App. 69, 72, 568 S.E.2d 867, 869, disc. review denied, 356 N.C. 442, 573 S.E.2d 163 (2002). Under N.C. Gen. Stat. § 15A-1444, a defendant who has pled guilty has the right to appeal only the following issues:
(1) whether the sentence is supported by the evidence (if the minimum term of imprisonment does not fall within the presumptive range); (2) whether the sentence results from an incorrect finding of the defendant's prior record level under N.C. Gen. Stat. § 15A-1340.14 or the defendant's prior conviction level under N.C. Gen. Stat. § 15A-1340.21; (3) whether the sentence constitutes a type of sentence not authorized by N.C. Gen. Stat. § 15A-1340.17 or § 15A-1340.23 for the defendant's class of offense and prior record or conviction level; (4) whether the trial court improperly denied the defendant's motion to suppress; and (5) whether the trial court improperly denied the defendant's motion to withdraw his guilty plea.
State v. Carter, 167 N.C. App. 582, 584, 605 S.E.2d 676, 678 (2004) (citing State v. Jamerson, 161 N.C. App. 527, 528-29, 588 S.E.2d 545, 546-47 (2003)).
In this case, Defendant's contention that he was denied proper credit for time served in pretrial confinement is not one of the appealable issues enumerated in N.C. Gen. Stat. § 15A-1444. Nevertheless, Defendant could have petitioned this Court for a writ of certiorari. N.C. Gen. Stat. § 15A-1444(e) (2007) (allowing defendant to petition for review by writ of certiorari); N.C. R. App. P. 21 (writ of certiorari may be issued where right to appeal has been lost). However, Defendant did not file such a petition, nor did he request that we treat his appeal as a petition for writ of certiorari. Accordingly, this assignment of error is dismissed. See State v. Bolinger, 320 N.C. 596, 601, 359 S.E.2d 459, 462 (1987) (defendant not entitled to review of allegation that the trial judge erred in accepting a guilty plea; since defendant made no motion to withdraw the guilty plea, he could only obtain appellate review upon grant of writ of certiorari, and defendant failed to petition for writ of certiorari).
We note that appellate counsel for Defendant submitted a brief on 12 October 2009 in reply to the State's brief. Under our rules of appellate procedure, a reply brief is limited "to a concise rebuttal to arguments set out in the brief of the appellee which were not addressed in the appellant's principal brief or in a reply brief filed pursuant to Rule 28(h)(2)." N.C. R. App. P. 28(h)(3). Here, appellate counsel's arguments are merely embellished recitations of those made in his principal brief on appeal, in violation of North Carolina Rule of Appellate Procedure 28. We admonish counsel for this violation.
We conclude that Defendant received a fair trial, free of error.
NO ERROR.
Judges STROUD and BEASLEY concur.
Report per Rule 30(e).