# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs September 28, 2010

## STATE OF TENNESSEE v. JOHN EDWARD DAWSON

**Appeal from the Circuit Court for McMinn County and the Criminal Court for Monroe County**
**McMinn Co. Nos. 07-225, 08-239, Monroe Co. Nos. 07-210, 09-004**
**1.Amy Reedy, Judge**

---

### No. E2009-02469-CCA-R3-CD[1] - Filed January 13, 2011

---

As part of a global plea agreement disposing of charges in four cases from two separate counties, the defendant, John Edward Dawson, entered pleas of guilty to three counts of theft of property valued at $1,000 or more but less than $10,000; one count of burglary; one count of vandalism of property valued at $1,000 or more but less than $10,000; two counts of the sale of less than .5 grams of cocaine; and two counts of the sale of a Schedule III controlled substance in exchange for a total effective sentence of eight years' incarceration to be served concurrently with a previously imposed federal sentence.  The defendant also reserved for our review the following certified question of law:  "Whether there was sufficient proof of an interference by State authorities of the defendant's right to counsel and a showing of prejudice as a matter of law from the allegations presented at the hearing on the Motion to Dismiss that letters allegedly drafted by a detective from the Monroe County Sheriff's Department and contact directly with a Monroe County detective convinced defendant he was represented by other counsel and should not communicate with appointed counsel and thus interfered with defendant's constitutionally protected right to counsel and due process under both the United States and Tennessee Constitutions."  Because the egregious actions of the law enforcement officers in this case substantially and profoundly interfered with the defendant's right to counsel under the state and federal constitutions, we reverse the judgment of the trial court denying the motion to dismiss, vacate the defendant's guilty pleas, and dismiss the indictment in each of the four cases.

**Tenn. R. App. P. 3; Judgments of the Circuit and Criminal Courts Reversed and Dismissed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE

---

[1]The appeals from both counties were consolidated upon motion by the State.

OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Jeanne L. Wiggins, Assistant District Public Defender, for the appellant, John Edward Dawson.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; R. Steven Bebb, District Attorney General; and James H. Stutts, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In May 2007, the McMinn County grand jury returned an indictment in case number 07-225 charging the defendant with three counts of theft of property valued at $1,000 or more but less than $10,000. In July 2007, the Monroe County grand jury returned an indictment in case number 07-210 charging the defendant with the sale or delivery of .5 grams or more of cocaine and the sale or delivery of dihydrocodeinone, a Schedule III controlled substance. In July 2008, the McMinn County grand jury charged the defendant in case number 08-239 with a single count of theft of property valued at $60,000 or more. On July 21, 2008, the Monroe County Criminal Court issued a writ of habeas corpus *ad prosequendum* to secure custody of the defendant, who was then incarcerated in a federal penitentiary. Following his return to the jurisdiction, the defendant was arraigned, appointed counsel, and incarcerated in the Monroe County Jail. Then, in January 2009, the Monroe County grand jury charged the defendant in case number 09-004 with the sale or delivery of less than .5 grams of cocaine and the sale or delivery of dihydrocodeinone, a Schedule III controlled substance.

On May 7, 2009, the defendant's appointed counsel filed a motion for a continuance on the basis of her discovery that a member of the Monroe County Sheriff's Department had represented himself as two separate attorneys, had pretended to handle parts of the defendant's case on the defendant's behalf, and had instructed the defendant to cease communication with appointed counsel. Counsel noted that she had previously requested a mental evaluation of the defendant in January 2009 on the basis of his claiming to be represented by a "federal" attorney. One week later, citing the same grounds, counsel filed a motion to dismiss the indictments in all four cases on the basis that the State had inappropriately interfered with the defendant's right to counsel.

At a May 15, 2009 hearing, the defendant's counsel stated that despite filing a request for a speedy trial, she had filed two motions to continue based upon the defendant's failure to cooperate with her. She noted that although the defendant had recently become cooperative, she did not know at that time the full extent of the interference with her

representation or what privileged information had been garnered by the State as a result of the fraudulent representation scheme. The trial court, over the State's objection, permitted the defendant to present proof of his claims.

Monroe County Sheriff's Department Detective Doug Brannon testified that he had an in-person meeting with the defendant at the Monroe County Jail sometime in January 2009. Detective Brannon stated that, at the behest of Monroe County Sheriff's Department Detective Pat Henry, he met the defendant in a visitor's booth. According to Detective Brannon, Detective Henry explained that he had been utilizing Monroe County inmate Todd Sweet to gain information from the defendant about the defendant's active cases. He stated that it was his "understanding that Mr. Sweet had [led] [the defendant] to believe that Mr. Sweet was connected with, generically the mob or a mob or a gang organization, a criminal organization and what I was purporting to represent was a contact of Mr. Sweet's in that organization." He said that he did not tell the defendant his name.

Detective Henry also showed Detective Brannon a letter Detective Henry had created using the identity of a fictitious attorney named Paul Harris. He stated that Detective Henry told him that he used such letters as a means to communicate with Mr. Sweet without having the communications read by jail staff. Detective Brannon testified that he approached the defendant as asked, and he described their conversation as follows:

> It was brief, I would guess less than five minutes, and it was to, the gist of the conversation was referring to I think Mr. Sweet, he tells us, and I'm paraphrasing, he tells us generically that you are in, if he trust[s] you I trust you. I referred to . . . [i]f when you got out if you were to get a call to do a job could you come and do the job, those kinds of things, which [the defendant] replied in the affirmative.

Detective Brannon admitted that he also told the defendant, per Detective Henry's instructions, "that there was a potential that he would be getting out" on "the following Saturday." He said that he told the defendant "to be ready to get out." Detective Brannon, who claimed to be unaware of the defendant's pending charges or the fact that he was represented by counsel, stated that he did not advise the defendant of his rights, explaining, "Obviously I was not representing myself as an officer." He said that he removed from his person all items identifying him as a police officer and that he borrowed a "dress coat" from another officer for the purpose of having this meeting to "gather or to reinforce" the defendant's trust in Mr. Sweet. He said that he could not recall whether he had told the defendant that he worked for Paul Harris.

-3-

Detective Brannon testified that he was present when Detective Henry released a vehicle to a man and a woman but that he did not know the reason for the vehicle's release or its connection to the defendant's case. He also testified that he had listened to recordings of conversations between the defendant and Mr. Sweet in the cell they shared at the Monroe County Jail.

Former Monroe County Detective James Patrick Henry, who was working as a "securities investigator" for Regions Bank at the time of the hearing, testified that during his investigation of the defendant, he began working with Mr. Sweet in an attempt to gain information from the defendant. As part of his scheme with Mr. Sweet, Detective Henry wrote letters to Mr. Sweet wherein he pretended to be an attorney named Paul Harris. At that point in Detective Henry's testimony, the trial court advised Detective Henry of the 5th Amendment privilege against self-incrimination. The court granted a recess for Detective Henry to consult a lawyer.

Following a brief recess, the court indicated that it wanted to continue hearing proof while awaiting the continuation of Detective Henry's testimony. Monroe County Jail Corrections Officer Ronnie Belcher testified that Detective Henry had provided him with letters to give to Mr. Sweet. He said the letters indicated that they were sent by an attorney, so he treated them as legal mail.

Monroe County Sheriff's Department Detective Conway Mason testified that he was aware that Detective Henry was utilizing Mr. Sweet to gain information about the defendant. He said that he had "downloaded" recorded conversations between Mr. Sweet and Detective Henry to compact disc format but that he had not listened to the conversations himself.

The defendant testified that upon his return to Monroe County, he was incarcerated in the Monroe County Jail and that Todd Sweet was his cell mate. The defendant said that he received a total of six letters purporting to be from attorneys Paul Harris and Neil Fink "out of Detroit, Michigan" and that five of the letters were addressed to Mr. Sweet and one was addressed to him. He testified that the letters delivered to Mr. Sweet were actually directed at him. The letter addressed directly to the defendant, which was exhibited to his testimony, purported to be from "Neil Fink, Attorney at Law"[2] and read as follows:

[2]The defendant originally said that the letter was from Paul Harris, and the State argued that the defendant had made "a false statement under oath." It is abundantly clear from the record, however, that the defendant, who had received six letters, was simply confused regarding the author of this letter in particular.

-4-

As I am writing this, I am preparing for a meeting with the District Attorney to get your red Chevy truck released. If all goes as should, the truck should be released no later than Tuesday, December the 30th. I did not call you out personally due to the fact that Mr. Sweet and I could be listened to by TBI. As you are aware Mr. Sweet is facing several charges in multiple states and several law enforcement agencies are attempting to record our conversations. This is why my associate Mr. Harris had the cell checked for recording equipment. Mr. Barrett has assured me through the judge that your release will take place sometime this week. We will talk once your truck is released. Any further conversations should be made through Mr. Sweet because he speaks Sicialian [sic]. Do not discuss this matter or your release with any other attorneys or family. To do what we must do it is important that your release is kept quiet. I will see you this week, keep your stuff packed.

Following the defendant's receipt of the letter, his truck was in fact released to his wife. The defendant testified that Mr. Sweet spoke exclusively "in Sicilian" when communicating with "Paul Harris" on the phone "so that the recorders . . . couldn't understand at the jail what they were saying." He stated that he believed that Paul Harris and Neil Fink were lawyers whose purpose was to secure his release from the jail.

The defendant testified that Detective Brannon pretended to be working with attorneys Harris and Fink and that Detective Brannon told him "that everything has went good with the truck and the truck is fixing to be released, that [he] would be getting out by the next Saturday, to keep [his] stuff packed." He stated that when Detective Brannon came to the jail to meet with him, he was told by Officer Belcher that Detective Brannon was actually his attorney. He said that attorneys Harris and Fink told him, via Mr. Sweet, to instruct his appointed counsel "to have this put off as many times" as was possible. He said that Mr. Sweet spoke on the telephone with Detective Henry, who masqueraded as either Paul Harris or Neil Fink, and that the two men spoke primarily in "Sicilian." Following these conversations, Mr. Sweet would then convey the messages to the defendant. The defendant said that Mr. Sweet and Mr. Harris spoke on the telephone every day for four months. The court excluded as inadmissible hearsay those messages conveyed orally to the defendant by Mr. Sweet.[3]

---

[3] It appears, however, that these statements, because the purpose of their introduction would have (continued...)

The defendant testified that the remainder of the letters were addressed to Mr. Sweet but that Mr. Sweet told him the letters were directed to the defendant. The first of these reads:

*LAW OFFICE*
*OF*
*Paul Harris*

TO: Mr. Sweet
Re: Truck
Advise Mr. Dawson that the release of the truck has been secured. He needs to have a representative from his family contact Detective Henry, at 423-442-5002 at 10 AM on December 31, 2008, to arrange getting the truck from the evidence impound. This issue has successfully been handled, and Detective Henry was advised to release the truck tomorrow. This was the agreement that was reached today with our meeting with him and the assistant district attorney. Mr. Fink will be in touch with you Friday.

Respectfully,
Paul Harris

Another, also on letterhead of the "Law Office of Paul Harris," reads:

Dear Mr. Sweet,
I received your letter and am sorry for the delay in responding. I found that the information that you gave me on your case was interesting. I have begun the process of pro hac vechie [sic] on your behalf. As you are aware from our first conversation, due to the nature of the charges that you are facing, credibility is a major issue to deal with. Before we can meet and discuss this further I need to prepare an argument to present to other court officials. In order to do this I would request that you give me a

---

[3](...continued)

been solely for their effect on the hearer and not their truth, would not have been hearsay. *See* Tenn. R. Evid. 801 ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Indeed, it was the defendant's position that the statements were patently false.

couple of details of the first series of events that you wrote to me about. This would over come the credibility issue and go along [sic] way with respect to resolving your issues. Please respond to me the same manner as before. I look forward to hearing from you soon. I have made arraignments [sic] to speak with you in private, and the items you requested will be available, upon delivery of the aforementioned details.

Respectfully,
Paul Harris

The defendant explained that the items referred to in the letter were things that Mr. Sweet and Mr. Harris had purportedly discussed during their daily telephone conversations.

The third letter, also from the "Law Office of Paul Harris," reads:

Mr. Sweet,
I am as s[h]ocked and outraged as you over the cell being searched and the disrespect that was shown to you and your cell mate. I am and will further be addressing this issue with the jail staff. Do not worry, I had a meeting with the assistant DA yesterday and all is going forward as planned. You will speak to him no later than Monday. By the way Doug is will [sic] back in town in a couple of days. He will again meet with you both.

Respectfully,
Paul Harris

The defendant explained that the "Doug" referred to in the letter was actually Detective Brannon.

The last letter, also from the "Law Office of Paul Harris," reads:

To: Todd Sweet
Re: Meeting
I have been informed by the Jail Administrator that the issue with over crowding in your cell has been addressed. I had an associate present during the search of your cell, there was no recording equipment or bugs in the cell. I was able to defend

you and your cell mates on the issue of contraband found, stating that the former trust[y] that was in the cell was responsible for the items. As you requested your shoes are with this letter, and money has been placed on your books. I have spoken with Mr. Fink, and he has agreed to handle the property issue on behalf of your cell mate. He will address this issue next week, due to the holiday, he was unable to approach the assistant district attorney. I have also arranged for us to meet again next week to prepare more for trial.

Respectfully,
Paul Harris

Following the receipt of this letter, money and shoes were provided to Mr. Sweet purportedly from Mr. Harris. The shoes given to Mr. Sweet were fitted with a recording device.

The defendant testified that he believed that the fictitious attorneys Harris and Fink were representing him on all of his charges. He stated that the "lawyers" instructed him not to cooperate or discuss any of the underlying facts of his cases with appointed counsel. He said that he believed that "[t]hey had it all under control." He discussed what he believed to be his imminent release with his wife and other family members.

During cross-examination, the defendant testified that he had received attorney mail only on two previous occasions, once from his federal defender and once from the assistant district attorney general in the cases at issue. The defendant said that "it hit [him] April the 9th what was going on." He stated that when he learned that the assistant district attorney had authorized the release of his truck, he believed that the district attorney's office was involved in the chicanery. He stated that it was possible that he met with retained counsel at the jail sometime between January 20, 2009, and April 9, 2009, but he could not specifically recall having done so. He admitted that he received the bulk of his information from Mr. Sweet, but he maintained that with Detective Brannon's "coming and acting to be a lawyer" and the assistant district attorney general's "releasing [his] truck, [he] thought everything was true." He said that he specifically remembered Detective Brannon because he had promised to get the defendant released from jail.

During redirect examination, the defendant said that he had no interest in working with appointed counsel while he was purportedly represented by attorneys Harris and Fink and that he had turned down plea offers from the State because he thought he would be released based upon their promises. The defendant said that attorneys Harris and Fink said that they would call appointed counsel.

-8-

At that point in the hearing, Detective Henry returned with his newly retained counsel and invoked his 5th Amendment right to remain silent.

The defendant's wife, Katrina Dawson, testified that on one occasion the defendant asked her "to take a letter and some pictures to the Loudon exit to the Country Inn Suite, a motel, and leave it for a Neal Fink, and another time it was to a Sweetwater motel and to leave [it] for a Neal Fink." She said she left the materials, which had been placed in an envelope addressed to Mr. Fink, with the front desk clerk at both locations. It was her understanding that the attorneys were helping the defendant resolve all of his federal and state charges. She said she "started believing" the ruse when the truck was released to her "after two years of begging." She said that the pictures she delivered were of the defendant holding a recorder he had found in his cell.

Monroe County Sheriff Bill Bivens testified that conversations made from the telephones inside the cells were recorded. He stated that he was aware of "some contact as far as tape recordings" involving Detective Henry and the defendant and of "maybe one or two of the letters, not nothing to amount to anything other than just one or two, . . . some correspondence in some manner." He stated that he did not "see a problem with" Detective Henry's scheme but noted "if it's illegal of course I don't want to do it." He said that the Sheriff's Department had not investigated Detective Henry's conduct.

Tennessee Bureau of Investigation Special Agent David Guy testified that he had spoken with District Attorney General Steven Bebb about Detective Henry's using Mr. Sweet to garner information from other inmates. He explained,

> I had voiced my concern to the General in reference to the use of Mr. Sweet by law enforcement in another investigation due to the fact that I had been, I had chased Mr. Sweet so to speak all the way across the country, knowing that he was an escapee from a Michigan prison system, I felt that Mr. Sweet had never offered to give anything to law enforcement other than a hard time and an attempt to con them out of whatever he could. I felt concern that he might try to use this situation to escape if it continued and it became something where they were working with him [on] a day to day basis, and I voiced my concerns to the General. He agreed with me and he said, "I'm going to stop that right now," and so he picks his cell phone up and he makes a call and I'm standing there and he speaks to Sheriff Bivens advising Sheriff Bivens that he did not want Sweet used in any manner in any investigation, that he was in jail on another case

and he was represented.  That was the end of the conversation and they hung up.

He recalled that the conversation took place in November 2008.

At that point, the hearing was continued because the defendant wanted to present the testimony of Mr. Sweet but could not do so because Mr. Sweet's counsel was unavailable.  Defense counsel expressed concerns about the continuance because she was unsure "that Mr. Sweet will be available after June the 22nd."  The trial court continued the hearing until August 10, 2009, and set a trial date for October 27, 2009.

When the hearing reconvened on August 10, 2009, defense counsel indicated that she had only received the recordings from the jail on the previous Friday and that she had not had time to review all the recordings.  She asked for a continuance, noting that because she was unsure of the information in the recordings, she did not believe an October trial date was appropriate.  The court agreed to continue the hearing but would not continue the trial date, stating that "every delay and continuance in this case has been requested and caused by counsel for the defendant."  The court told counsel that the August 10, 2009 hearing would be "the last opportunity [she had] to put on witnesses in this motion to dismiss," despite counsel's insistence that she did not know where the information contained in the jail recordings would lead her investigation.  The court stated that it would continue the hearing to October 26, 2009, but that it would not hear witnesses, would not give the motion priority, and would not allow a great amount of time for the motion on that day.

When the hearing reconvened on October 26, 2009, the day before the scheduled trial date, the trial court noted that it "did not intend on taking up a prolonged or protracted continuation of a motion hearing" and that it was "not planning on listening to a lot more proof today."  When counsel pointed out that an additional motion had been filed, the court stated simply, "I didn't set it today for an additional hearing."  The trial court restricted the defendant's proof on that day to argument only, despite defense counsel's noting that she had not been provided with the recordings of telephone calls placed from the jail to Detective Henry posing as either Paul Harris or Neil Fink.

During her argument at the October 26, 2009 hearing, defense counsel stated that given Detective Henry's invocation of his Fifth Amendment rights and the absence of the recorded telephone conversations, the defense was unable to establish the extent of communications between the defendant and Detective Henry.  She stated, "Mr. Dawson should not be punished because we cannot get the information that establishes just how far it went."

-10-

The State insisted that the defendant had been provided with all of the relevant recordings. In addition, despite the rather conclusive proof that Detective Henry had indeed posed as an attorney and undertaken fraudulent representation of the defendant, the prosecutor argued that the defendant had failed to present proof "to establish that this supposed interference with counsel's ability to prepare actually took place." The prosecutor insisted that the defendant had failed to carry his "burden of proof to demonstrate either an in[ter]ference with representation or an actual prejudicial affect on the ability to carry out the trial."

At the conclusion of the hearing, the trial court denied the motion, concluding that the defendant had made "a real dumb decision" when he "decided that Todd Sweet is going to be his lawyer." The court stated that the defendant "picked his poison and as a result of that this [c]ourt granted the motion to continue to get him in a position where he needs to be which is focused on defending these charges and to quit worrying about who Todd Sweet can help him with or not."

Later on that same day, the defendant pleaded guilty pursuant to the global plea agreement to three counts of theft of property valued at $1,000 or more but less than $10,000; one count of burglary; one count of vandalism of property valued at $1,000 or more but less than $10,000; two counts of the sale of less than .5 grams of cocaine; and two counts of the sale of a Schedule III controlled substance in exchange for a total effective sentence of eight years' incarceration to be served concurrently with a previously imposed federal sentence. The State, based upon its evaluation that there was insufficient proof to support the charge, entered a judgment of *nolle prosequi* in McMinn County case number 08-239. The defendant also reserved for our review the following certified question of law:

> Whether there was sufficient proof of an interference by State authorities of the defendant's right to counsel and a showing of prejudice as a matter of law from the allegations presented at the hearing on the Motion to Dismiss that letters allegedly drafted by a detective from the Monroe County Sheriff's Department and contact directly with a Monroe County detective convinced the defendant he was represented by other counsel and should not communicate with appointed counsel and thus interfered with defendant's constitutionally protected right to counsel and due process under both the United States and Tennessee Constitutions.

In this appeal, the defendant asserts that the actions of Detective Henry and other members of the Monroe County Sheriff's Department interfered with his Sixth

-11-

Amendment right to counsel as well as his due process rights and that this court should presume that the defendant was prejudiced based upon "the extent of the contact both with respect to the type of relationship . . . and from the protracted period of time" involved. The defendant also notes that his ability to establish prejudice was hampered by Detective Henry's invocation of his Fifth Amendment privilege against self-incrimination. The State concedes that the actions of the members of the Monroe County Sheriff's Department interfered with the defendant's right to counsel but argues that the defendant has failed to prove prejudice warranting dismissal. We agree with the defendant.

One of the fundamental components of our adversarial system of justice, *see Argersinger v. Hamlin*, 407 U.S. 25, 29-33 (1972), the right to the assistance of counsel during all critical stages of the criminal trial process is guaranteed by both the state and federal constitutions. *See* U.S. Const. amend. VI ("[I]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."); Tenn. Const. art. 1, § 9 ("[I]n all criminal prosecutions, the accused hath the right to be heard by himself and his counsel."). The right to counsel embodied in the Sixth Amendment "'attaches only at or after the initiation of adversary proceedings against the defendant . . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *United States v. Gouveia*, 467 U.S. 180, 187-88 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 688-89 (1972)). In this state, the right attaches following the issuance of an arrest warrant, the holding of a preliminary hearing when no arrest warrant precedes the hearing, or the return of an indictment or presentment by the grand jury. *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980). In this case, because the defendant had been indicted, the Sixth Amendment right to counsel had attached, and, indeed, counsel had already been appointed to represent the defendant.

Once the right to counsel has attached, the State is under an affirmative duty to ensure that no action is taken to interfere with an accused's right to counsel. The United States Supreme Court has explained the role of the State after the right to counsel has attached:

> Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation

-12-

not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

*Maine v. Moulton*, 474 U.S. 159, 170 (1985). "[K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." *Id.* at 176; *see also generally United States v. Henry*, 447 U.S. 264 (1980); *Brewer v. Williams*, 430 U.S. 387 (1977); *Spano v. New York*, 360 U.S. 315 (1959). When "seeking evidence pertaining to pending charges," the investigative tools of the State "are limited by the Sixth Amendment rights of the accused." *Moulton*, 474 U.S. at 179-80.

That being said, "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). *Morrison*, as does this case, involved law enforcement interference with the defendant's right to counsel. In that case, members of the Drug Enforcement Agency ("DEA") attempted to interrogate Morrison after formal charges were levied and after she had retained counsel. Agents disparaged Morrison's retained counsel and encouraged her to communicate with them despite her counsel's advice to remain silent. Unlike this case, however, Morrison immediately reported the inappropriate contact to her counsel, who then filed a motion to dismiss based upon the agents' conduct. The Supreme Court recognized that the agents had violated Morrison's right to counsel but found that dismissal of the indictment was inappropriate given that Morrison had not alleged and could not prove even a transient deprivation of the right to counsel. The court observed that unless the constitutional infringement "has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense," no remedy was warranted. *Id.* at 365.

The facts presented here differ in two very important ways from those presented in *Morrison*. First, the DEA agents who violated Morrison's right to counsel identified themselves as law enforcement officers. Here, despite the attachment of the defendant's constitutional right to counsel and his appointment of counsel, Detective Henry adopted a scheme with the help of the defendant's cell mate, Todd Sweet, to garner the defendant's trust and actively engage the defendant in discussing the facts of his pending cases by pretending to be a licensed attorney willing to undertake representation of the defendant. As part of this scheme, Detective Henry authored letters under the guise of lawyers named Paul Harris and Neil Fink. The detective went so far as to create letterhead, have the letters delivered in the same manner as other legal mail, and to manipulate the circumstances of the defendant's case to make it appear as though the fictitious attorneys

were securing positive results in their representation of the defendant. Both the defendant and his wife testified that they became completely convinced of the legitimacy of the letters and Mr. Sweet's promises after Detective Henry arranged the release of the defendant's truck. Detective Henry's subterfuge did more than simply infringe upon the defendant's right to counsel, it completely usurped it. Because the violation remained unknown to the defendant, he was unable, as Morrison was, to immediately report the violation and subject it to remedy. As a result of Detective Henry's actions, the defendant remained wholly without the benefit of counsel for a period spanning several months. During this time, the indictment in case number 09-004 was returned against the defendant. When a defendant remains without the benefit of "counsel able to invoke the procedural and substantive safeguards that distinguish our system of justice, a serious risk of injustice infects the trial itself." *Cuyler v. Sullivan*, 446 U.S. 335, 343 (1980).

Second, where Morrison simply could not prove prejudice under the circumstances of her case, the defendant here was prevented from proving any prejudice by Detective Henry's invocation of his Fifth Amendment right to remain silent. Because Detective Henry exercised his right to remain silent under the Fifth Amendment, the defendant could not establish what, if any, information was gained from the elaborate ruse. The defendant's attempt to establish prejudice was further hampered when the trial court erroneously excluded as hearsay the defendant's own testimony about conversations between the parties. The defendant was again thwarted in his attempt to prove prejudice when Mr. Sweet did not testify at the May 15, 2009 hearing due to the unavailability of his lawyer and then the defendant was prohibited from presenting testimony at the October 26, 2009 hearing. In consequence, any failure of proof in this case was not occasioned by any action or inaction of the defendant.

Although the *Morrison* Court, in a footnote, cautioned against the use of dismissal of the indictment as a means to deter the deliberate infringement of the right to counsel, particularly in the absence of a showing of specific prejudice, the conduct of the law enforcement officers in this case, and in particular Detective Henry, is so egregious that it simply cannot go unchecked. That Detective Henry would illegally pose as an attorney[4] and arrange the circumstances of the defendant's case to make it appear as though he had successfully undertaken legal representation of the defendant is abhorrent. That the detective would specifically instruct the defendant not to communicate the relationship to his appointed counsel, in what we can only assume was an effort to enlarge the time for the detective to gain incriminating information from the defendant, renders completely

---

[4]"It is unlawful for any person who is not licensed to do so, to practice or pretend to be licensed to practice a profession for which a license certifying the qualifications of the licensee to practice the profession is required." T.C.A. § 39-16-302(a) (2006).

reprehensible the state action in this case. Given the unconscionable behavior of the state actors in this case and the fact that the defendant was essentially prevented from proving prejudice through no fault of his own, we have no trouble concluding that the only appropriate remedy in this case is the dismissal of all the indictments.

Accordingly, the judgments of the trial court denying the defendant's motions to dismiss in each case are reversed. The defendant's pleas are vacated, and the indictments in McMinn County case numbers 07-225 and 08-239 and Monroe County case numbers 07-210 and 09-004 are dismissed.

_____
JAMES CURWOOD WITT, JR., JUDGE